UNITED STATES v. FULKERSON et al.

(District Court, S. D. California. May 18, 1896.)

No. 820.

1. INDICTMENT—REV. ST. § 3894—MAILING DOCUMENT CONCERNING LOTTERY.
In an indictment under Rev. St. § 3894, for depositing in a post office a document concerning a lottery, an allegation that an envelope deposited by the defendant "contained a certain pamphlet concerning a certain lottery, which said lottery was then and there being conducted by a certain corporation, called," etc., sufficiently affirms the existence of a lottery.

2. SAME.
In such an indictment, an allegation that the defendant "did knowingly deposit" in the post office a certain phamphlet concerning a lottery, sufficiently alleges that the defendant knew that the matter deposited concerned a lottery, since the word "knowingly" qualifies, not only the verb "deposited," but the whole matter described.

3. LOTTERY—REV. ST. § 3894.
The U. Co. conducted a business, the essential features of which were as follows: In consideration of a membership fee of $5 and monthly dues of $2, it entered into contracts with persons who desired to become members, purporting to be contracts of indemnity in case of sickness, accident, or death, and issued to them certificates, containing the usual provisions of similar insurance policies. To each such certificate were attached 50 coupons of $10 each, which were numbered consecutively, those on the first certificate issued running from 1 to 50, those on the second certificate issued from 51 to 100, and so on, indefinitely. The certificates were issued in the order in which applications were received, by mail or otherwise, and there was no means of knowing, prior to the issue of a certificate,

how many had been issued previously, nor what would be the numbers of the coupons to be attached to it. It was provided that one-half of the amounts received from monthly dues should be placed in a so-called "Maturity Fund," and that, whenever there should be sufficient money in said fund to pay one or more coupons, such number of coupons should be paid, and that the coupons to be paid should be determined by taking, first, the coupon numbered 1, then that numbered 5, and so on, in a geometrical progression, with the ratio 5, until the series reached the highest numbered coupon sold; then taking that numbered 2, then 10, etc., in a second series, with the ratio 5, and so on, until the numbers of all the coupons sold should be included in some series. It was also provided that, at the end of 3 years, each certificate holder should receive the full amount paid in monthly dues; at the end of 5 years, $150; at the end of 7 years $300; and at the end of 10 years $500,—but the only resources to provide for such payments were the membership fees, and certain inconsiderable portions of the monthly dues; the remainder of such dues, after providing for the maturity fund, being devoted to an expense fund, and a sick, accident, and death fund. *Held*, that this scheme was a lottery, within the meaning of Rev. St. § 3894.

Geo. J. Dennis, U. S. Atty., and Frank G. Finlayson, Asst. U. S. Atty.

H. A. Pierce, for defendant Fulkerson.

Allen & Flint, for defendant Wood.

WELLBORN, District Judge. This is a prosecution for violation of section 3894 of the Revised Statutes of the United States (1 Supp. Rev. St. § 803). Defendants have demurred to the indictment on the grounds hereinafter noticed. There are two counts in the indictment. The first count charges that the defendants "did knowingly deposit, and cause to be deposited," in the post office at Los Angeles, Cal., a certain pamphlet, and other instruments, concerning a lottery then and there conducted by a corporation called "United Indemnity Company," and sets forth in full copies of said pamphlet and said instruments, and then alleges the scheme or plan of said lottery to be as follows:

"To enter into contracts between said United Indemnity Company and persons becoming members thereof, a separate contract being made with each person, each of said contracts to purport to be a contract of indemnity in case of sickness, accident, or death. To issue to each such person becoming a member of said corporation a certificate of like tenor and effect as the certificate hereinbefore set forth, if, in consideration of the entering into of said contract by said United Indemnity Company, such person, becoming such member, shall pay a membership fee of five dollars, and a monthly premium of two dollars for full benefits, or a monthly premium of one dollar for half benefits, such premiums to be paid monthly, quarterly, semi-annually, or annually; and to further provide, in said contract, that a failure to pay premiums when due by the holder of any certificate should not work a forfeiture of said certificate, but that such, failure to pay should suspend the holder of such certificate from any benefits thereunder, and that his membership should lapse until he should be reinstated by payment of the requisite amount due therefor; and to attach to each certificate, so issued to persons becoming members of said corporation, fifty coupons, of the denomination of ten dollars each, each of said coupons to be of the tenor and effect following, that is to say:

" '$10 Coupon.

" 'When signed and presented at the home office, the United Indemnity Co. will pay bearer ten dollars, under the conditions set forth in the contract of which this is a part.'

—"The appropriate number of each coupon being stamped upon the face thereof; said certificates, pursuant to said plan or scheme of said lottery, to be numbered, in their regular order, as applications for membership should be received, commencing with the number one (1); and to attach to each of said certificates, so issued, fifty coupons,—to the first certificate, to wit, certificate numbered number one (1), to attach fifty coupons, and to number the same from number one (1) to number fifty (50), both numbers inclusive; to the second certificate, to wit, certificate numbered number two (2), to attach fifty coupons, and to number the same from number fifty-one (51) to number one hundred (100), both numbers inclusive; and, in the same manner, as each successive certificate should be issued, to attach fifty coupons thereto, said coupons to be numbered consecutively, the number of the highest numbered coupon sold being equal to the product of the number of the highest numbered certificate issued multiplied by fifty; and, in pursuance of, and in connection with, and as a part of said plan or scheme of said lottery, to create a fund, to be called the 'Maturity Fund,' by retaining for that purpose one-half of the monthly dues which should be paid monthly by persons holding certificates of membership, as aforesaid, which said maturity fund was to be used for the purpose of redeeming, in a certain order (hereinafter described), and at such times as there should be sufficient money accumulated in said maturity fund, the said coupons, so attached, as aforesaid, to the said certificates so to be issued, as aforesaid,—that is to say: if, at any time, there should be in the said maturity fund a sum of money sufficient to pay two or more coupons, then the coupons then due and payable, in accordance with said order of payment, should be paid, and to deduct from any coupon maturing and payable, in accordance with the plan or scheme of said lottery, any excess above double the amount of monthly dues paid thereon; and, if more than one coupon should mature during any month, to deduct the same amount from each, and to place the excess in a fund called the 'Redemption Fund,' and to use said redemption fund for the purpose of redeeming certificates. To establish the following order for the payment of the said coupons so, as aforesaid, to be attached to the said certificates, so, in pursuance of said plan or scheme of said lottery, to be issued, as aforesaid, that is to say: First, to pay coupon numbered number one (1); next, to pay coupon numbered number five (5); next, to pay coupon numbered number twenty-five (25); and thus to proceed, in the payment of said coupons, in an increasing geometrical progression, with the number five (5) as the ratio of progression, the first term of the progression being the said numeral one, and the last term of the progression, and of the series, being the highest number of the series included within the number of the highest numbered coupon sold; and, when thus proceeding from the numeral one (1), as the first term of the progression, the last term of the progression should no longer be contained within the number of the highest numbered coupon sold, then to pay the coupon numbered number two (2); then to pay the coupon numbered number ten (10); then to pay the coupon numbered number fifty (50); and to thus proceed, in an increasing geometrical progression, with the number five as the ratio of progression, and the number two (2) as the first term thereof, until the last term of the progression should be reached, which said last term would be the highest number in said series included within the number of the highest numbered coupon sold; and, when thus proceeding from the numeral two, as the first term of said progression, the last term of said progression should no longer be contained within the number of the highest numbered coupon sold, then to pay the coupon numbered number three (3); then coupon numbered number fifteen (15); then coupon numbered number seventy-five (75); and thus proceeding, in an increasing geometrical progression, with the number five (5) as the ratio of the progression, and the numeral three (3) as the first term of the progression, until the last term of the progression should be reached, which said last term would be the highest number in such series included within the number of the highest numbered coupon sold, when a new series should be commenced, the first term of which would be the numeral four (4), and the ratio of progression being the number five (5); and thus continuing until the number of each and every coupon sold should be found in some one of such series, the terms of which proceed in an increasing

geometrical progression, with the number five (5) as the ratio thereof. And the grand jurors aforesaid, on their oath aforesaid, do say that the said plan or scheme of said lottery, so by them substantially set out, as aforesaid, involves the further fact that an applicant for membership in the said United Indemnity Company does not know how many certificates might be issued prior to the issuance of his certificate, nor how many certificates have elapsed prior to the issuance of his certificate to him; and said plan or scheme of said lottery involves the further fact that such applicant for membership does not know, and cannot know, whether the certificate that shall be issued to him shall have attached thereto a coupon or coupons whose day of payment shall be near, or a coupon or coupons whose day of payment shall be remote, but the nearness or remoteness of said day of payment is a matter of chance only."

In said pamphlet appears, among other things, the following:

"A New Feature. Granted Only by the United Indemnity Company.

"To each certificate is attached fifty coupons, of ten dollars each. The certificates are numbered in their regular order as applications are received, commencing with number one (1), to which is attached coupons from one to fifty, inclusive. All coupons are paid in their regular order, as soon as there is sufficient money in the maturity fund, which is composed of one-half (½) the monthly dues. The first coupon to be paid shall be number one (1), the second shall be coupon number five, (5), the third coupon paid shall be number twenty-five (25), etc., so long as the multiple five (5) comes within the highest numbered coupon sold; then reverting to and paying coupon number two (2), then ten (10), then fifty (50), etc., always reverting to and counting from the lowest numbered unpaid coupon sold, whether in force or not. One-fourth of the monthly dues constitute the sick, accident, and death fund. The remaining one-fourth of said dues constitute the expense fund. Any coupon maturing shall have deducted therefrom any excess above double the amount of monthly dues paid thereon. Provided more than one coupon matures during any month, the same amount shall be deducted from each, and the excess placed in the redemption fund, which fund shall be used for the redemption of certificates as follows: At the end of three years, the company will return to the certificate holder the full amount paid to the company in monthly premiums; at the expiration of five years, $150; at the expiration of seven years, $300; at the expiration of ten years, $500,—less moneys received under its certificates.

"Temporary Loans.

"The board of directors may loan to the maturity fund any excess above $25,000 that may accrue in the indemnity and redemption funds. In case of an emergency, any surplus in the expense fund will be temporarily used to meet the same, thus adding to the company unusual features of strength."

Among the other papers contained in said envelope was an instrument entitled, on one side, "Application for Membership in the United Indemnity Company of Los Angeles, California," and on the other, or obverse, side, headed with the word "Confidential," which said instrument, on the former side, is, in part, as follows:

"Membership Fee, $5.00. First Month's Premium must Accompany This Application.

"Application for Membership in the United Indemnity Co. of Los Angeles, California. Room 439 Bradbury Blk.

"Certificate 245. Class A.

"I hereby apply for membership in the above company, to be based upon the following statement, which I warrant to be true:

"Full name, ——. Age, ——.

"Residence, ——. County of ——.

"Street No. ——. State of ——.

"My occupations are ——.

"Insurance in } Accidental death $——. Weekly Indemnity { Accident
    case of  } Natural death $——.        in case of      { Sickness.

"A premium of $—— per month will be paid monthly, quarterly, or yearly. My death benefits shall be paid to ——, whose relationship to me is that of ——.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"The liability of the association shall be always subject to its existing by-laws, and to amendments or alterations that may be made thereto, and I agree that this application, and the terms of the certificate to be issued in consequence thereof, and the by-laws, shall be the basis of membership between me and said association, and I agree that the contract, when made, shall be held and construed, at all times and places, to have been made in the city of Los Angeles, California, and that benefits due me are payable there, and that, if suit is brought to enforce said contract, that the same shall be brought in the courts of said city and county, and not elsewhere; and I declare that the acting president of the association shall have the power, in my absence, at any and all future meetings of the members or board of directors of the association, to act as my attorney in fact, and to deposit the vote to which I would be entitled, provided it should be deemed necessary for the preservation and protection of the best interests of the association. And that any person other than the assured presenting this application to the secretary of the association for acceptance shall be my agent, and not the agent of the association, and that there must accompany this application not less than one full month's dues (of $2.00 or $1.00 for half rate) or application will not be accepted.

"Dated this 1st day of Nov., 1895.

"Witness: ——.

"Signature of applicant: ——."

And the other side of said instrument is as follows:

"Confidential.

"Dear Wm. Hayes: If you do not wish to pay dues on the enclosed certificate No. 245 (see application on back hereof), we have made arrangements with parties who are willing to advance all payments for you, from month to month, on conditions that you permit them to receive all benefits from coupons maturing during such time within three years, as you may not pay the monthly dues, during which time your benefits will be limited to weekly indemnity in case of accident only. In case you desire to pay dues after the parties referred to have made one or more payments for you, the company shall be permitted to retain from the first coupons on your certificate maturing thereafter the purchase price and the amount of monthly dues that have been advanced for you. The above offer is made to a limited number, for the purpose of introducing our business throughout a wide range of territory, with a view of securing agents. Should you secure any business for the company, we will allow you the membership fee, to say the least. Please refer us to some live agents. Fill out and sign application on back hereof, and return to home office. In case you do not wish Hall & Co. to advance dues for you, accompany this application with $2 dues for the coming month; otherwise Hall & Co. will pay same for you, under above agreement.

"Respectfully,                                     The United Indemnity Co.

"If what we here tender you is not appreciated, return in 5 days."

The certificate referred to in the instrument last copied is as follows:

"No. 245.                                                      Class A.

"United Indemnity Co. of California.

"In consideration of the sum of $5.00, membership fee, and of the representations and agreements contained in the application for membership, and a compliance with the rules and regulations of the company, which are referred to, and made a part hereof, also the sum of $2.00, being payment for the first month's dues to it, in hand paid, and the agreement to pay a like sum on or before the first day of each month thereafter, does hereby accept Wm. Hayes, age ——, residing in Colton, state of Calif., whose occupation

is ——, under class ——, as a member of the United Indemnity Company. and, by virtue of said membership, entitled said member to all benefits under this certificate and the by-laws of the company.

"Section 1. In case the company does not receive to the member's credit, at its home office in Los Angeles, California, the monthly dues of $—— on or before 30 days from date of this certificate, the same will become suspended.

"Sec. 2. Should said member receive bodily injury through external violent accident, which shall produce visible marks upon the body, and which shall immediately totally disable the member from work, the company will indemnify the member for the time of total disability in the sum of $—— per week, for a period not exceeding 26 weeks, during any year following date of this certificate, except as provided in the application.

"Sec. 3. Should the disability, as above mentioned, after membership for six months immediately prior to the happening of the accident, during which time this certificate has at no time been suspended, solely and alone cause the death of the member within sixty days from the happening of the accident, then the company will pay to —— $——.

"Sec. 4. After membership for four months without delinquency, immediately prior to the beginning of illness, should the member become ill from any disease not chronic in nature, not excepted by the application, nor caused by narcotics, intoxicants, epidemics, excesses, or immoral conduct on h—— part, and be wholly incapacitated from transacting any work or business pertaining to h—— occupation, and as the result thereof be confined to the bed for not less than seven consecutive days,' the company will pay (not exceeding 26 weeks during any year) the sum of $—— per week, provided that in no case shall there be any liability for any ,disease not common to both sexes.

"Sec. 5. After membership without delinquency for six months immediately prior to the beginning of an illness resulting in death, within 60 days from the beginning of said illness from any cause which would entitle the member to sick benefits, then the company will pay to —— $——.

"Sec. 6. Of the monthly dues paid hereon, one-half shall be placed in the maturity fund for redeeming coupons, in their regular order, as often as there is a sufficient amount in said fund. The first coupon to be paid is No. 1, the second is No. 5, the third is No. 25, and so on, so long as the multiple 5 comes within the highest numbered coupon sold; then reverting to and paying coupon No. 2, then 10, then 50, and ,so on, always reverting to and counting from the lowest numbered unpaid coupon sold, whether in force or not. One-fourth of the monthly dues constitute the accident, sick, and death fund, and one-fourth of said dues constitute the expense fund.

"Sec. 7. It is agreed that any coupon maturing shall have deducted therefrom any excess above double the amount of monthly dues paid thereon. Provided more than one coupon matures during any month, the same amount shall be deducted from each, and the excess placed in the redemption fund, which fund shall be used for returning to the certificate holder, at the end of three years from date of this certificate, the monthly dues paid thereon; at the end of five years, $150; at the end of 7 years, $300; at the end of 10 years, $500,—less moneys received under their certificate, provided 30 days' notice shall be given within 90 days prior to surrender period. Face value of coupons maturing during suspension will be deducted from surrender values.

"Sec. 8. Payment of $1.00 per month entitles the holder to one-half benefits.

"Sec. 9. In case of necessity, temporary interchangeable loans may be made between the redemption fund and the indemnity fund, and any excess above $25,000 dollars that may accrue in the redemption fund may be lent to the maturity fund.

"Paragraph 1. Payment of claims arising hereunder shall be payable at the office of the company in Los Angeles, California, within ninety days from date of satisfactory proof, to be submitted upon blanks furnished by the company for that purpose.

"Par. 2. And provided, further, that the company shall not be liable for any disability or death that may happen to the holder hereof after he or she shall have passed his or her seventieth birthday.

"Par. 3. No suit or proceeding, at law or in equity, shall be commenced prior to the expiration of ninety days after the receipt of proof satisfactory to the company at its home office. All claims under this certificate shall be

subject to proof of insurable interest. The liability of the insured hereunder is not limited to a fixed premium.

"Par. 4. Fraud or concealment in obtaining membership, or attempting, by like means, to obtain indemnity, shall make the membership and this certificate void.

"Par. 5. The beneficiary can be changed only on application to the home office. Should the membership lapse for any cause whatever, and be reinstated by the company, no claim of any kind will be allowed between the date of lapse and fifteen days after the date of reinstatement; the applicant then being in good health. A full compliance with each and every provision, condition, and requirement hereof, and with the by-laws, is a condition precedent to any liability of the company hereunder, and waiver of any of the aforesaid provisions, conditions, or requirements cannot be made, nor shall be claimed, by the act or acts or understanding of any agent, or other person whatsoever.

"In witness whereof, the United Indemnity Company has hereunto affixed its corporate seal, and caused these presents to be signed by its president and attested by its secretary, and delivered at the office of the company in Los Angeles, state of California, this first day of First, one thousand eight hundred and ninety-five.

"[Seal United Indemnity Company.]

"J. L. Fulkerson, President.
"R. N. Wood, Secretary."

Attached to this instrument are fifty coupons, numbered from 12,201 to 12,250, inclusive, and each being, except as to their numbers, in the words and figures following:

"$10 Coupon.

"When signed and presented at the home office, the United Indemnity Co. will pay bearer ten dollars, under the conditions set forth in the contract of which this is a part."

The second count of the indictment is disposed of in the last paragraph of this opinion. To the first count the objections urged are—First, failure to allege the existence of a lottery; second, failure to allege knowledge, on the part of the defendants, that said pamphlet and instruments concerned a lottery; third, that the plan or scheme set forth in the indictment does not constitute a lottery. My conclusion, as to each one of these objections, will be briefly stated:

1. One of the allegations of the indictment, with reference to the envelope which defendants are alleged to have deposited in the post office, is as follows:

"And which said envelope then and there contained a certain pamphlet concerning a certain lottery, which said lottery was then and there being conducted by a certain corporation called 'United Indemnity Company.'"

If this part of the indictment does not directly affirm the existence of a lottery, it would be difficult to find language that would accomplish that result; and this seems to be the opinion of attorneys for defendant Fulkerson, for, in their last brief filed in cases 815 and 816, March 18, 1896, at pages 3 and 5, and speaking of the allegations in the indictments in said cases, as to the existence of a lottery, they say:

"'This may be the opinion of the pleader, that a certain lottery existed, but that existence is not charged. When did it exist? When was it 'conducted'? Had he said that the matter concerned a certain lottery then and there being conducted, I grant you that would have been equivalent to an allegation of the existence of a lottery; but the statement 'a certain lottery conducted' is simply by way of recital," etc.

The indictment in the case at bar is much more specific and direct, in this respect, than were the indictments in the cases of Horner v. U. S., 147 U. S. 462, 13 Sup. Ct. 409, and U. S. v. Conrad, 59 Fed. 458. See, also, State v. Willis, 78 Me. 74, 2 Atl. 848.

2. With reference to the second objection above stated, I am of opinion that the words of the indictment, "did knowingly deposit," etc., in their ordinary acceptation, mean that defendants knew that the matter which they are alleged to have deposited in the post office concerned a lottery. On this point I shall follow, not the ruling in U. S. v. Slenker, 32 Fed. 691, but the views expressed by Mr. Justice Brewer, as follows:

"Doubtless, the question turns largely on whether the word 'knowingly,' as used in the statute and the indictment, qualifies simply the adjacent verb 'deposit,' or the whole matter described. It may be conceived that, ordinarily, an adverb is understood as qualifying its adjacent verb, and yet that is not always true; and, in construing words and sentences used in an indictment, we are to give them their ordinary significance, in the absence of some technical construction necessarily imposed upon them. Now, it is a familiar use of the adverb 'knowingly' that it qualifies both its adjacent verb and the full act thereafter described. A few simple illustrations will make this clear: I say that a party knowingly told a lie. Every one understands from that that I mean that the party has stated that which he knew to be a lie, and not simply that he stated that which was in fact untrue, yet unknown to him to be untrue. And in the same way, when I say that a party knowingly deposited an obscene picture, no one supposes that I mean that he simply deposited a picture, the character of which he was ignorant of. All understand that I mean to say that he has deposited that which he knew to be obscene, and this because the adverb 'knowingly,' used in sentences of this kind, by the common understanding of all, goes beyond the mere verb, and includes broadly all that is expressed in the full act charged to have been done." U. S. v. Clark, 37 Fed. 107.

The same ruling has been made by Judge Shiras, of the Northern district of Iowa, who makes the following reference to the case last cited:

"In U. S. v. Clark, 37 Fed. 106, the same question was passed upon by Mr. Justice Brewer, then circuit judge for this circuit; it being therein held that an indictment charging the defendant with knowingly depositing in the post office, for mailing and delivery, a certain lewd and obscene picture, was sufficient, as it would be held that the word 'knowingly' qualifies the full act charged to be done, and is not limited to the mere act of depositing in the post office. Following this ruling, it must be held that the indictment in the present case is sufficient in this particular, and the demurrer is therefore overruled." U. S. v. Nathan, 61 Fed. 936.

See, also, Dunbar v. U. S., 156 U. S. 185, 15 Sup. Ct. 325.

In this last case, Mr. Justice Brewer, delivering the opinion of the court, enunciates substantially the same doctrine declared by him in U. S. v. Clark, supra, and also distinguishes U. S. v. Carll, 105 U. S. 611. The following cases are also in line with Justice Brewer's views: U. S. v. Chase, 27 Fed. 807; State v. Williams (Ind. Sup.) 38 N. E. 339; People v. Stanton, 39 Cal. 698. See, also, Rosen v. U. S. (No. 424; decided Jan. 6, 1896) 16 Sup. Ct. 434. From the last cited case I make the following extract:

"In their ordinary acceptation, the words 'unlawfully, willfully, and knowingly,' when applied to an act or thing done, import knowledge of the act or thing so done, as well as an evil intent or bad purpose in doing such thing; and, when used in an indictment, in connection with the charge of having de-

posited in the mails an obscene, lewd, and lascivious paper, contrary to the statute in such case made and provided, could not be construed as applying to the mere depositing in the mail of a paper, the contents of which at the time were wholly unknown to the person depositing it."

It is true that in that case the ruling was confined to the facts before the court, the objection having been made after verdict; but the reasoning of the opinion, as shown by said extract, is equally applicable to a case where the objection is presented on demurrer.

3. The remaining question to be determined is whether or not the scheme set forth in the indictment is such a one as the statute denounces. The term "lottery" has been often defined by high authorities, and I shall not undertake original definitions, but employ and adopt such as have heretofore received judicial approval. "The statute," said Judge Deady, "is directed against the use of the mails for the conveyance of any advertisement of 'any lottery or gift enterprise of any kind.' This language is sufficiently comprehensive to include any scheme in the nature of a lottery. It cannot be deemed necessary to here enumerate the many similar definitions given by lexicographers and courts of the term 'lottery.' It may be sufficient to say that it embraces the elements of procuring, through lot or chance, by the investment of a sum of money, or something of value, some greater amount of money or thing of greater value. When such are the chief features of any scheme, whatever it may be christened, or however it may be guarded or concealed by cunningly devised conditions or screens, it is, under the law, a lottery." U. S. v. Wallis, 58 Fed. 942. To the same effect, the supreme court of the United States has approvingly referred to decisions of the state courts and of England, as follows:

"As to what have been held to be lottery tickets by the courts of the several states, reference may be had to * * * Chavannah v. State, 49 Ala. 396, where it was held that the venturing of a small sum of money for the chance of obtaining a greater sum was a lottery; Com. v. Sheriff, 10 Phila. 203, where it was said that whatever amounted to the distribution of prizes by chance was a lottery, no matter how ingeniously the object of it might be concealed. * * * In Sykes v. Beadon, 11 Ch. Div. 170, 190, there were holders of certificates, who subscribed money to be invested in funds, which were to be divided among them by lot, and divided unequally,—that is, those who got the benefit of the drawings got a bond bearing interest and a bonus, which gave them different advantages from the persons whose certificates were not drawn,—and it depended upon chance who got the greater or the lesser advantage. The scheme was held to be a subscription by a number of persons to a fund, for the purpose of dividing that fund among them by chance, and unequally; and Sir George Jessel, master of the rolls, characterized the scheme as a 'lottery.' In Taylor v. Smetten, 11 Q. B. Div. 207, packets were sold, each containing a pound of tea, at so much a packet. In each packet was a coupon entitling the purchaser to a prize, and that fact was stated publicly by the seller before the sale, but the purchasers did not know until after the sale what prizes they were entitled to, and the prizes varied in character and value. The tea was good, and worth the money paid for it. It was held that the transaction constituted a lottery, within the meaning of the statute." Horner v. U. S., 147 U. S. 449, 13 Sup. Ct. 409.

In the light of these authorities, careful examination of the pamphlet and other instruments copied in the indictment satisfies me that the scheme therein outlined is a lottery, and, besides, deludes with false and mischievous pretenses. The confidential communica-

tion of the United Indemnity Company to Hayes, set out in the indictment, is a specimen of these pretenses. That communication, after inviting Hayes to membership in the company, informs him that an arrangement has been effected, whereby a certain Hall & Co. will advance all payments, from month to month, on account of the membership tendered Hayes, and thus provide him with financial indemnity against accident, on condition that he will permit said Hall & Co. to receive all benefits from coupons maturing during such time. Full characterization of the document is unnecessary. I refer to it simply because of the implication it carries, that the chances for securing lucky coupons are so great that Hall & Co. were willing, for these chances, to meet all of the expenses of the membership gratuitously proffered to Hayes. This false allurement itself points out the vicious nature of the scheme, and stigmatizes its so-called "indemnity feature" as but a mask for the real object,—distribution of prizes by chance. The scheme provides that one-half of the total receipts of the company, outside of the membership fee of five dollars, shall constitute what is called a "maturity fund," which fund, as fast as accumulated, is redistributed among the subscribers, according to a plan characterized by as much uncertainty and chance as it is possible to impart to any scheme. It should be remembered, in this connection, that the "maturity fund" is not put at interest, or in any way invested, but simply paid back, as fast as accumulated, to certain of the subscribers. This fact, itself, argues the existence of that gambling element which the law condemns; for no man, however absolutely he relied upon the ignorance and credulity of his intended dupes, would ever devise or promote a scheme whereby persons are invited to raise, by voluntary contributions, a fund solely for the purpose of redistribution among themselves, unless to each there was offered a chance of getting back something more than he contributed. The element of chance, however, is specifically and clearly discernible in the facts that the numbers of the coupons which any particular applicant receives depends upon the order in which his application goes in to the company, and that the determination of what coupons shall be paid is made to depend upon a device of numbers, whose operations are such that it is utterly impossible for any one to know the result, until the same has been accomplished. It is true that no wheel is employed, from which, at stated periods, tickets are drawn ; but the machinery of the scheme, embracing the postal establishment of the United States, is perpetually in motion, and prizes, in the shape of so-called "matured coupons," continually distributed to those who secure the lucky numbers. This scheme, in many respects, is similar to that in the case of MacDonald v. U. S., 63 Fed. 426, 12 C. C. A. 339, which was unqualifiedly condemned by the court. From the opinion in that case I make the following quotation:

"It is insisted that the element of chance is wanting in the scheme, but its presence is manifest. It is not present primarily in the uncertainty of the time when a bond will be paid, because, once bonds have been issued, the order of payment is governed by a fixed rule, and the time of payment is un-

certain only so far as it depends upon the amount of business done by the company, and the number of lapses of bonds of earlier issue. The element of chance, which condemns the scheme, is incident to the numbering of the bonds before issue, and not directly to their payment afterwards. By the table which determines the order of payment, bond numbered one is payable first, No. five next, No. two next, and so on, alternating between numerals, so-called, and multiples of five, except, it will be observed, that between every fourth and fifth of the multiples no numeral intervenes. There are four numerals to every multiple, and it follows that a bond (which might as well be called a 'ticket') bearing a high multiple number will be entitled to payment sooner than three-fourths of the bonds bearing lower numbers among the numerals, and the further the process is carried the greater becomes the disparity between the multiple and numeral numbers next to be paid, and, correspondingly, the bonds numbered with numerals, except as benefited by lapses, become less and less valuable, because the day of possible payment becomes more and more remote. Now, whether or not a purchaser will obtain a bond of one number or another depends, as the evidence very clearly shows, upon the order in which his application shall reach the hand of the secretary; and that is largely a matter of chance. The secretary receives applications by mail and otherwise, sometimes singly, and sometimes a number together, and in the order of receipt, and, as he chances to take up one or another first, passes them through a registering device, and, in accordance with the notations thereby made upon the applications, the bonds are numbered and issued. But for the purchaser's hope—or, as it may as well be said, for his chance—of getting a multiple number, the business would soon cease. 'The multiple system is a new invention,' said a witness for the defendants, 'a table, copyrighted, to make the inducement for a person to purchase a bond at one time just as great as at another;' and, however disguised in words, it is evident that the inducement consists mainly in the chance of obtaining a multiple number. It was insisted at the hearing that, since every bondholder who shall continue to pay his dues will ultimately receive the promised sum, the prizes are equal, and therefore there is no lottery. But it is idle to say that a sum or an obligation for a sum due and payable to-day, or at an early day, is of no more value than an obligation for an equal amount, without interest, payable at a remote and indefinite time. Reference has been made to Horner v. U. S., 147 U. S. 449, 13 Sup. Ct. 409, but, in the elaborate presentation there made of the subject, we find nothing which we deem inconsistent with our views of the present case."

The language of Judge McComas in U. S. v. Sherwood (Sup. Ct. D. C.; opinion filed June 23, 1894; not to be reported), in some respects, is directly pertinent here:

"The plan of this National Investment Society, as set forth in the letter, circulars, and by-laws, shows that it is impossible for the members to share equally in the funds, and that the more fortunate applicants are those whose certificates bear the earliest numbers; that the number of the certificates, and their consequent value, depends upon chance. In different states, applicants, on the same day, may mail subscriptions for certificates in this company. Whether or not an applicant will receive a certificate of one number or another depends upon the order in which the applications may reach the officer of this company who issues the certificates, and that is a matter of chance. This officer receives these applications by mail, or otherwise. It may be one at a time; it may be many at the same time; and, according to the order in which he chances to receive them, or as he chances to take up one or another, and determines the number of each applicant's certificate, the certificates are numbered and issued. He who by these chances luckily receives an earlier number will be paid sooner, and will pay in less money than another, who, subscribing on the same day, receives a later number, and will by these chances be required to pay longer and more money, and wait longer for payment of his shares. It is this element of chance in numbering the certificates which I believe to be a violation of this anti-lottery law. It is evident that the inducement to subscribe consists mainly in the chance of securing an early or lucky number. As in Ballock v. State, 73 Md. 1, 20 Atl. 184, approved in Horner v. U. S., 147 U. S. 463, 13 Sup. Ct. 409:

'It cannot be said this is not a species of gambling, and that it does not tend, in any degree, to promote a gambling spirit. It certainly cannot be said that it is not in the nature of a lottery, and that it does not tend to create a desire for other and more pernicious modes of gaming.' The element of chance which condemns this scheme as a lottery, or similar enterprise, dependent upon chance, is incident to the numbering of the certificates before issue, and not directly to their payment afterwards."

In answer to this, however, defendants quote from Judge Blodgett's opinion in U. S. v. Zeisler, 30 Fed. 499, as follows:

"If these drawings determined only the time when these bonds would be paid, I should say that the mere determining of that time by lot or drawing would not give them the characteristics of a lottery."

Whatever may be thought of the correctness of this statement of Judge Blodgett, it is a sufficient answer now to say that the statement was made in connection with facts, which, in one essential particular, at least, were different from the facts of the case at bar. The bonds referred to by Judge Blodgett were sure of payment, some time or other. Such, however, is not the situation here. As shown by the certificate set out in the indictment, one-half of the monthly dues was to be set apart as a "maturity fund," from which the coupons attached to the certificates were to be paid as often as there was a sufficient amount in said fund, it being provided, however, that from any coupon maturing there should be deducted any excess over double the amount of monthly dues paid thereon, and that, if more than one coupon should mature during any month, a similar amount should be deducted from each. This excess, which necessarily could only be an inconsiderable part of one-half the monthly dues received by the company, was to be placed in a fund called the "Redemption Fund," to be used for returning to the certificate holder, at the end of three years from the date of his certificate, "the monthly dues paid thereon; at the end of five years, $150; at the end of seven years, $300; at the end of ten years, $500." Certainly, the mere statement of this plan shows that it was impossible of fulfillment, and that the certificate holders, not only were not sure of ultimate payment, as in the Zeisler Case, but, by the very terms of the certificate, it was impossible that all should be paid. Furthermore, it seems to me incontrovertible that an obligation for a given amount due to-day is more valuable, by at least current rate of interest, than an obligation for the same amount due one year hence, without interest. If this be true, it follows, unavoidably, that time of payment is an essential element of value in non-interest-bearing obligations, and a scheme which involves such obligations, and matures them by chance, the other requisites being present, is a lottery.

I think both counts of the indictment good,—the first for the reasons given in this opinion, and the second for reasons indicated in my opinion (U. S. v. Fulkerson, 74 Fed. 631) filed to-day in case No. 815.

Demurrer overruled.