## UNITED STATES v. McGUIRE et al.
### No. 327.

Circuit Court of Appeals, Second Circuit.
April 10, 1933.

MANTON, Circuit Judge, dissenting.

490

George Z. Medalie, U. S. Atty., and Louis Mead Treadwell and Edmund L. Palmieri, Asst. U. S. Attys., all of New York City. .

Max D. Steuer, of New York City (Irving J. Levy, of New York City, of counsel), for appellant McGuire.

Martin Conboy, of New York City (Joseph R. Kelley and David Asch, both of New York City, of counsel), for appellant Mann.

Basil O'Connor, of New York City (Samuel B. Pettengill, of South Bend, Ind., and William F. Snyder, of New York City, of counsel), for appellant Hering.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge (after stating the facts as above).

The basis of the demurrer is that the tickets which the government alleged the defendant caused Finn to receive were tickets "which had theretofore been transported" in interstate commerce, and that they did not themselves purport to be lottery tickets as the indictment with its facsimile was claimed to show on its face.

The statute (18 USCA § 387) on which the first count was drawn only applies in so far as this appeal is concerned to tickets "purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance. * * *" In overruling the demurrer, the judge indicated his view that the purport of the ticket could be shown by extrinsic evidence. He cited Reilley v. United States (C. C. A.) 106 F. 896, in support of this conclusion, with the further suggestion that Francis v. United States, 188 U. S. 375, 23 S. Ct. 334, 47 L. Ed. 508, might be considered in accord, though Reilley v. United States was reversed in the Francis Case, since nothing was then said in the majority opinion in disapproval of the proposition. As the Reilley Case was reversed, we do not understand that failure to mention any point decided below can be thought to mean approval of the ruling. Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 24 S. Ct. 538, 48 L. Ed. 788; Southern Ry. Co. v. Commonwealth of Kentucky, 284 U. S. 338, 52 S. Ct. 160, 76 L. Ed. 327. We

accordingly feel free to decide the question as one still open.

Little light can be shed upon the intention of Congress in using the word "purporting" in this statute from its history or by comparing it with the statute relating to the use of the mails. 18 USCA § 336. Nor does it appear to be needed. Purporting means "to have the appearance or to convey the impression of being, meaning, or signifying (some particular thing)." Webster's International Dictionary. These tickets themselves gave all the evidence of what they had the appearance of being and so of what they purported to be. An inspection of the tickets disclosed what they purported to be provided the person who saw them knew what their appearance signified. They were the best evidence of their own appearance, and, as an exact reproduction of one of the tickets, which disclosed the appearance of all, was included in the indictment, no evidence to show how they looked, other than the tickets themselves, or secondary evidence of that after a proper foundation was laid for it, could be resorted to in support of the indictment. However, a thing has the appearance of being some particular thing only to a person who knows how that particular thing looks. For instance, a person who knows how a lottery ticket looks could tell by looking at something else whether it purported to be a lottery ticket. But not so one who had no knowledge of the appearance of a lottery ticket. So it cannot be said broadly that no evidence other than that of a given paper, certificate, or instrument itself may ever be used to prove what it purports to be. With this limitation, however, these tickets themselves disclosed what they purported to be, and they came within the purview of the statute involved in this case only if such a ticket as shown by the indictment appeared to be a lottery ticket on its face.

In our judgment the ticket did under this construction of the statute come within its terms. It was well adapted for such use. The language of the statute is not wholly restrictive as the appellants seem to think, but rather by making appearance the test might in some instances apply to what was not a lottery ticket in fact. The absence of any language on the ticket to indicate that the prizes were to be awarded by lot or chance is not conclusive. But the absence of anything to indicate that they could or would be awarded in any way other than by lot or chance, coupled with the ease with which their construction permitted this method to be used, afforded all that was necessary to give them the appearance which the statute covered.

Another ground of the demurrer strikes directly at an element essential to federal jurisdiction and is fatal to the first count. The defendants were alleged to have caused Finn to receive the tickets which had theretofore been transported in interstate commerce. True it is that the use of the word "theretofore" was unfortunate as the District Judge remarked. He thought that 18 USCA § 556, relating to defects and imperfections in an indictment in matters of form, disposed of the matter. But that does not answer the demurrer in this respect. If the words of the indictment are given their usual meaning, the interstate carriage of the tickets had ended before the defendants caused Finn to receive them, and it might have ended an indefinite time before. This statute must be strictly construed. France v. United States, 164 U. S. 676, 17 S. Ct. 219, 41 L. Ed. 595. It is the authority of Congress to regulate interstate commerce which makes such a statute valid. Champion v. Ames, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492. After the tickets, though they had been sent from Pennsylvania to New York, were received from the interstate carriage in New York, they were no longer in interstate commerce. Sonneborn Bros. v. Cureton, 262 U. S. 507, 43 S. Ct. 643, 67 L. Ed. 1095. And the allegations that they had theretofore been so sent when the defendants caused Finn to receive them means that interstate transportation of them was, as of that time, a thing of the past. It had ended. If a crime was alleged, proof that would show that the defendants caused Finn to receive the tickets after their delivery in interstate commerce to the original consignee and they had passed into the custody and possession of any number of persons within the state to which they had been shipped would have been sufficient to prove it. That is, proof of consummated interstate carriage however remote from their receipt by Finn coupled with proof that the defendants caused Finn to receive them at any time after such carriage would be enough. But no crime was alleged, since it was not only consistent with the averment, but it was the ordinary import of the language used, that the interstate shipment had ended before Finn received the tickets. An essential fact, viz. that the defendants caused Finn to receive the tickets in interstate commerce, was lacking. To withstand the

demurrer, the indictment had to allege all the facts necessary to be proved to constitute the offense. United States v. Simmons, 96 U. S. 361, 24 L. Ed. 819; Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830. And as this was a matter of substance and not of form, the verdict did not cure the defect, United States v. Hess, 124 U. S. 483, 8 S. Ct. 571, 31 L. Ed. 516; United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135, and defendant McGuire could raise the point as he did by his motion in arrest of judgment, United States v. Simmons, supra. The first count must be held bad as to all defendants.

There is no such disability as to the second count charging conspiracy. There are allegations that the defendants conspired to cause the tickets to be deposited for interstate carriage, as well as to be received, and allegations of acts done within the jurisdiction in furtherance of the conspirators' agreement. The verdict was general and will stand, since one count is good. Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830; Claassen v. United States, 142 U. S. 140, 12 S. Ct. 169, 35 L. Ed. 966.

The exceptions relating to the plea in abatement need not detain us. As we have held the first count bad, they need be noticed only as to the second count. There was no proof or offer of proof of any facts to show any want of evidence produced before the grand jury in support of the second count except what is claimed to have been an offer to prove by the testimony of an assistant district attorney who was called as a witness by the defendants that "there was no competent proof of any kind or nature before the grand jury as to the commission of any overt act or acts specified in the first and second count of the indictment." It would be going too far to believe that this offer embraced more than a legal conclusion, more than the assurance, obviously rather surprising, that the witness was ready to testify, if permitted, that in his opinion there was no competent evidence before the grand jury as to the commission of any of the overt acts specified in the second count. If this were enough, an investigation as to the competency of the evidence before a grand jury could be compelled by a respondent even where there was no suggestion of any misconduct on the part of jurors or irregularity in the panel. It would require a disclosure of the evidence, if the government can thus be required to justify the indictment, and in effect a trial of the grand jury before a respondent could be tried. It would provide a respondent in advance with much, if not all, of the government's case. Without discussing what power the court has, should there be real reason to believe that improper conduct has entered into the finding of an indictment, to inquire into the nature of the evidence before the grand jury, the assertion of the respondent that the evidence is insufficient will not avail. See Kastel v. United States (C. C. A.) 23 F.(2d) 156; Murdick v. United States (C. C. A.) 15 F.(2d) 965; McKinney v. United States (C. C. A.) 199 F. 25. The best evidence on this subject would have been the minutes of the grand jury. But they were not offered, and there is nothing to show that these respondents either knew what they contained or could have obtained them to offer in evidence. U. S. v. Violon (C. C.) 173 F. 501; U. S. v. Rubin (D. C.) 214 F. 507; U. S. v. Perlman (D. C.) 247 F. 158; U. S. v. Gouled (D. C.) 253 F. 242. Nor can it be thought that any different legal situation arises when the mere assertion that the evidence before the grand jury was insufficient takes the form of an offer to prove that conclusion in support of a plea in abatement. United States v. Morse (D. C.) 292 F. 273, 277, 278. Consequently, it was not reversible error to exclude the offer made.

Confining ourselves now to the second count, we are convinced that a conspiracy to cause what purported to be lottery tickets to be transported in interstate commerce by an express company was alleged and proved as to all these appellants. There was ample evidence from which the jury could find that McGuire proposed the scheme to Mann, that Mann approved, and that Hering conferred with Mann and acquiesced. Compare Rumely v. United States (C. C. A.) 293 F. 532. All three put their money and credit behind the plan, and, when the program had been carried out in the way the jury was justified in finding from the evidence these respondents had agreed it would be, they divided the profits among themselves.

An overt act done within this jurisdiction in furtherance of the conspiracy to transport these tickets in interstate commerce was alleged and proved in respect to the tickets received by Finn. Whether or not the tickets were in interstate commerce when they caused him to receive them, these defendants caused those tickets, in furtherance of their conspiracy, to be transported in interstate commerce within the Southern dis-

trict of New York to get them to him. The overt act in so doing was to attain that object of their conspiracy which was criminal in its nature under federal law, and its allegation and proof was sufficient to bring the offense within the classes of conspiracies covered by 18 USCA § 88. Lonabaugh v. United States (C. C. A.) 179 F. 476.

It is claimed that it was error to admit evidence to show how the scheme was carried out right down to the time the drawing was had on the boat and the respondents divided the proceeds. Of course, the offense charged is not conspiring to conduct a lottery, for we are not concerned with what might be unlawful only under state laws. However, the forbidden use of interstate carriage of what purported to be lottery tickets became fruitful to the respondents only as it made the lottery possible. Evidence to show how their scheme was of benefit to them disclosed the motive for their entering into it, and was admissible for that purpose. United States v. Noelke (C. C.) 1 F. 426. Moreover, although we have here only what might be called a conspiracy within a conspiracy to conduct a lottery, the conspiracy before us did not end until the money the conspirators realized, at least in part from it, was divided among them. What the conspirators did and caused to be done to fulfill the purpose of the conspiracy with which we are now dealing was properly shown. Shea v. United States (C. C. A.) 251 F. 440; Lew Moy v. U. S. (C. C. A.) 237 F. 50; Ferris v. United States (C. C. A.) 40 F.(2d) 837. Thus it was not error to show what was done with the tickets after they were transported according to the agreement of the conspirators. Whether they were strictly lottery tickets before they were actually sold goes to what they were in fact when transported, and leaves the proof that the conspirators agreed to cause to be transported, in violation of the statute, what purported to be lottery tickets still abundantly shown by the evidence.

Granted that after these tickets were sold to the public it would be unlawful to conspire to transport in interstate commerce only what purported to be that part which was kept by the purchaser, Francis v. United States, supra, it does not follow that it was not unlawful to conspire to transport from state to state the whole of these tickets before they were sold to the ultimate holders. Indeed, the tickets involved in The Lottery Case (Champion v. Ames) 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492, were alleged to have been "caused to be carried, as afore-said, for the purpose of disposing of the same," and in the opinion at page 353 of 188 U. S., 23 S. Ct. 321, 326, it is said, "These tickets were the subject of traffic; they could have been sold; and the holder was assured that the company would pay to him the amount of the prize drawn." Moreover, in Brooks v. United States, 267 U. S. 433, 45 S. Ct. 345, 346, 69 L. Ed. 699, 37 A. L. R. 1407, the Chief Justice took occasion to observe, "In the Lottery Case, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492, it was held that Congress might pass a law punishing the transmission of lottery tickets from one state to another, in order to prevent the carriage of those tickets to be sold in other states and thus demoralize, through a spread of the gambling habit, individuals who were likely to purchase." Nor did Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, in dealing with the prohibition of interstate shipment of the products of child labor, modify Champion v. Ames, supra, in respect to such transportation of things purporting to be lottery tickets.

The court in its instructions to the jury failed to mention the presumption of innocence. The omission was not called to its attention, nor was any exception taken. No reversible error has therefore been shown. Dinger v. United States (C. C. A.) 28 F.(2d) 548; Silverberg v. United States (C. C. A.) 4 F.(2d) 908.

After the jury had deliberated for about six hours, the court on its own motion recalled it and delivered a supplemental charge in which each juror was urged to get into his mind what his colleagues had to say before arriving at his final decision and then finally be guided by his own judgment. This did not usurp the province of the jury. Lias et al. v. United States (C. C. A.) 51 F.(2d) 215. It was plain common sense to point out a practical way to be followed by the jury in doing its work. Nor was it beyond the exercise of a sound discretion to recall the jury for further instructions. Allis v. United States, 155 U. S. 117, 15 S. Ct. 36, 39 L. Ed. 91; Dwyer v. United States (C. C. A.) 17 F.(2d) 696.

Judgment on the verdict on the first count reversed. Judgment on the verdict on the second count affirmed.

MANTON, Circuit Judge (dissenting).

The appellants have been convicted on two counts. The first charges that they

494

knowingly caused to be taken and received, at Middletown, N. Y., by one George Finn, on May 1, 1931, a book of 32 tickets alleged-

In 1926, Mann entered into a contract with the Board of Grand Trustees to conduct the affairs of the department of bazaars, fairs,

ly purporting to be lottery tickets and to represent chances, shares, or interest in a lottery which had theretofore been transported by common carrier from Pennsylvania to New York, violating section 237 of the U. S. Cr. Code (U. S. C. title 18, § 387 [18 USCA § 387]). The second count charges a conspiracy to knowingly cause the same tickets to be deposited with the common carrier for interstate carriage. It charges the commission of overt acts in the furtherance of the conspiracy. The conspiracy charged was to commit the offense mentioned in the first count. U. S. Cr. Code § 37, U. S. C. title 18, § 88 (18 USCA § 88). It appears that for the years prior to 1926, appellants Mann and Hering had been active in the affairs of the Fraternal Order of Eagles, the latter as editor of the magazine published by that order and the former as an officer in the order.

and like attractions. The contract provided that he should assume direction and control of this department for a period of ten years. His compensation was fixed at 40 per cent. of the net profits, 60 per cent. to be retained by the several subordinate aeries of the Eagles. On October 1, 1926, Mann entered into a contract with Hering transferring a third interest to him. This contract was for ten years. Until December, 1928, when the contract with the trustees was amended for the purpose of permitting Mann to utilize the services of independent promoters, the results were negligible. In December, 1930, McGuire became interested in the plan of fund-raising campaigns to be conducted under the auspices of the subordinate aeries of the order throughout the country. A conference took place on December 29 and 30, 1930, at which Mann,

McGuire, and the former's lawyer participated, and it was agreed that McGuire would train a staff of representatives to solicit the various subordinate aeries throughout the country to enter into contracts with the bazaar department of the order for the holding of frolics and dances. The plan of the venture was that each member of the subordinate aeries received a book of 32 tickets to be sold to the public at 50 cents each. Out of the proceeds of each book or portion thereof sold, the subordinate aeries received 25 per cent. plus an agreed contribution toward the expenses of the affair. The balance was remitted by the secretaries of the subordinate aeries to whom the members were to make returns to the bazaar department of the order. Each member of the order who sold a complete book of tickets was to receive a merchandise prize of the retail value of $18, and the secretaries received compensation for extra services to be performed in connection with their activities. Cash awards of $60,000 were to be made in connection with the venture. After all the expenses including the printing, transportation charges, and field expenses, as well as the cost of the merchandise prizes, were defrayed, the net profits were to be divided between Mann and McGuire. Hering would be entitled to one-third of Mann's share of the profits by reason of his contract, and would share one-third of the losses, if any. Mann's counsel, at the conference referred to, advised him that the enterprise was lawful. McGuire opened headquarters at Kansas City and began a fund-raising campaign.

The tickets were printed at Scranton, Pa. They were shipped, when printed, to Philadelphia, where they were placed in packages with certain literature, and consigned to individual members of the participating subordinate aeries through the Railway Express Agency. On their face the tickets entitled the purchasers to admission to a designated frolic and dance to be held under the auspices of the local subordinate aeries. When the ticket was sold, the purchaser wrote his name and address on the stub pertaining to the ticket so purchased; the stub being retained by the member who sold the ticket, the tickets themselves stating that the awards thereon referred to would be made August 12, 1931, and nothing more. On July 9, 1931, about a month after the last book of tickets was shipped in interstate commerce, a circular letter was issued to the officers and members of the subordinate aeries which had participated in the fund-raising campaign from the headquarters of the bazaar department bearing a mimeograph signature of Mann. It stated that the delegates of the subordinate aeries during the week of August 9, 1931, would meet at the Grand Aerie Convention at Toledo, Ohio, and there as members of the committee would take charge of making the awards. A number of witnesses, who served as representatives of the bazaar department of the order, testified that they informed the membership of the subordinate aeries when questioned that the making of the awards would be left to the committee, and this was done at McGuire's instruction. On the evening of August 12, 1931, the delegates to the Grand Aerie Convention assembled on a steamer for an excursion, and during the course of that night the awards were made by a drawing of the stubs of the tickets which had been sold by the membership of the order from a receptacle. The person whose name and address appeared on the first stub received the first prize, and this continued until 180 awards were made.

Appellant Hering's only connection appears to have been entering into the contract of October 1, 1926, with Mann. In March or April, Hering came to Kansas City at Mann's request for a consideration of meeting the liabilities on the contract, if it became necessary. No one testified as to what transpired at this meeting except a witness testified that "in a cursory sort of way, we [Hering and the witness, before and after the meeting] discussed the possibilities of its [the frolic and dance venture] being successful." A witness said that he met Hering at South Bend in July, 1931, and discussed in "a brief sort of way" this matter; that the $230,000 in checks received by Mann were deposited in the "Contingent Reserve" account kept under the contract between Mann and Hering, and that the latter received from this account $60,000 in 1931 and $7,500 in 1932. He drew no money from that account prior to July 1, 1931. Hering was on the boat at Toledo before the drawing took place. In any event, there was no evidence to warrant submitting Hering's guilt to the jury.

The court permitted evidence of events subsequent to the receipt of the ticket to show their purport. The prosecution is predicated upon the tickets purporting to be lottery tickets or to represent chances, shares, or interests in a lottery or similar gift enterprise. The purport of the tickets must necessarily be ascertained within the four corners of the tickets. Francis v. United States, 188 U. S. 375, 23 S. Ct. 334, 335, 47 L. Ed. 508; France v. United States, 164 U. S. 676, 17 S. Ct. 219, 41 L. Ed. 595. The

Francis Case did not in any way involve the question of whether or not the purport of documents could be shown by independent evidence, for it involved only the question of whether or not the government could by independent evidence, as it was required to, show that the lottery had not yet been held. The Supreme Court held in the France Case that the statute applied only to a lottery to be held and not to a lottery that had been held. After the decision in the France Case, the statute in questioned· had to be read as if the words "to be held" had been inserted after the words "lottery, gift enterprise, or similar scheme." When the Francis Case arose, it was obviously necessary for the government to allege and prove, as a material part of its case, that the lottery, in that case, was one that had not already been held, and in fact in the Francis Case the government so alleged. There was no question in that case as to whether or not the government could, by independent evidence, show that the documents purported to be lottery tickets. The court below, at bar, stated that the Francis Case held "that the purport of documents can be shown by independent evidence," and proceeded to do so, basing this primarily upon the statement that the District Court in the Francis Case had said: "Their purport may be shown outside of the papers." In the Supreme Court (Francis Case) Justice Holmes said:

"The assumption has been that the slips carried from Kentucky to Ohio were papers purporting to be or represent a ticket or interest in a lottery. But in our opinion these papers did not purport to be or do either. A ticket, of course, is a thing which is the holder's means of making good his rights. The essence of it is that it is in the hands of the other party to the contract with the lottery as a document of title. It seems to us quite plain that the alternative instrument mentioned by the statute, viz., a paper representing an interest in a lottery, equally is a document of title to the purchaser and holder—the thing by holding which he makes good his right to a chance in the game. But the slips transported, as we have pointed out, were not the purchasers' documents. It is true that they corresponded in contents, and so in one sense represented or depicted the purchasers' interests. But 'represent' in the statute means, as we already have said in other words, represent to the purchaser. * * * The function of the slips might have been performed by descriptions in a book, or by memory, if the whole lottery business had been done by one man. They as lit-

tle represented the purchaser's chances as the stubs in a check book represent the sums coming to the payees of the checks."

A review of what the proof shows transpired prior to the receipt of the tickets by Finn demonstrated that they were not in fact lottery tickets and did not represent chances in a lottery. The court below submitted the case to the jury as if the question was not one of the purport of the tickets, but what they were in fact and were known and intended to be by the appellants after the time of their transportation in interstate commerce. The tickets were shipped in a book of 32 to be sold by the recipient and to be accounted for to the secretaries of the subordinate aeries. If anything, Finn, the recipient of the tickets, took them from interstate commerce as the agent of the lottery and not as a purchaser. As stated, upon their face and when received, they did not represent chances or interests in awards any more than a bundle of unissued and unsigned certificates would show a property interest. It was not until after the interstate transportation had been completed and after the tickets had passed beyond the power of Congress to legislate respecting their use or control that they were in any sense used to represent chances in a lottery. United States v. Wade (D. C.) 59 F. (2d) 831.

Section 213 of the U. S. Cr. Code (18 US CA § 336), excludes lottery matter from the mail. It is broader in scope than the interstate lottery carriage statute (U. S. Cr. Code § 237 [18 USCA § 387]). It provides that no lottery ticket or part thereof, or paper, certificate, or instrument purporting to be or to represent a ticket, etc., in a lottery shall be deposited in the mail. The interstate lottery statute does not bar from interstate shipment lottery tickets or parts thereof, but is limited to "any paper, certificate, or instrument purporting to be or to represent a ticket," etc., in a lottery. The mailing statute bars both lottery tickets and tickets purporting to be lottery tickets. The interstate commerce statute bars only such tickets as purport to be lottery tickets. The distinction is clear and unambiguous, and the cases relied upon involving the mail statute (MacDonald v. United States, 63 F. 426 (C. C. A. 7); United States v. Fulkerson (D. C.) 74 F. 619; United States v. Wallis (D. C.) 58 F. 942) are not applicable.

The reason why Congress made this distinction between the two statutes probably was that the power of Congress to prohibit interstate shipment of lottery matter was un-

der the commerce clause and was in some doubt. In the Lottery Case, 188 U. S. 321, 23 S. Ct. 321, 326, 47 L. Ed. 492, the court had before it a statute which was limited, as is section 237 of the Criminal Code, to a prohibition against papers purporting to represent lottery tickets. The tickets transported, the court said, "Upon their face they showed that the lottery company offered a large capital prize, to be paid to the holder of the ticket winning the prize at the drawing advertised to be held at Asuncion, Paraguay." The majority of the Supreme Court (in 1903) decided that the statute was within the legislative powers of Congress under the commerce clause. In 1909 Congress passed the present law. It may well have had power to extend the scope of its prohibition to papers which while in interstate commerce were apparently not lottery tickets, but which would become such lottery tickets after the interstate carriage had ceased. But it did not do so.

That I think is the situation at bar. On the other hand, it has long been recognized that Congress had the power to establish post offices and the plenary power to keep the mails free from objectionable matter. Ex parte Jackson, 96 U. S. 727, 24 L. Ed. 877. The aid which Congress could give the states in suppressing lotteries under the commerce clause was assistance in preventing distribution of tickets or lottery information. That this was the intent of Congress was clear from the opinion of the majority in the Lottery Case, supra. Only by forbidding interstate carriage and deterring express companies could Congress help, and, before a crime was committed, it must be clear that the ticket was in fact a lottery ticket. This must be judged solely by what transpired before sending and what appeared on the face of the ticket when sent. Under this statute, Congress did not penalize the interstate transportation of lottery tickets as well as papers purporting to be lottery tickets, but significantly limited the application to papers purporting to be lottery tickets. The statute is highly penal, rendering its violators subject to fine and imprisonment (France v. United States, 164 U. S. 676, 17 S. Ct. 219, 41 L. Ed. 595), and the courts must construe it strictly. The statute does not cover the tickets sent to Finn. We must not construe the statute so as to extend it by judicial interpretation. Prussian v. United States, 282 U. S. 675, 51 S. Ct. 223, 75 L. Ed. 610.

If, as the prevailing opinion holds, the first count charging the substantive offense must be reversed, a conviction for conspiracy to violate the statute forbidding the transportation of lottery tickets should likewise be reversed. If any crime has been committed, it is a violation of the state law and not the national law.

The judgments should be reversed.