REILLEY et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. February 12, 1901.)

No. 849.

1. LOTTERIES—CONSTRUCTION OF FEDERAL STATUTE.

Act March 2, 1895, providing that "any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same, or deposited in or carried by the mails of the United States, or carried from one state to another in the United States, any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery," etc., defines three separate and distinct offenses; and to constitute an offense under either the second or third clause it is not necessary that the paper, certificate, or instrument should have been brought into the United States from abroad for the purpose of disposing of the same, those being the elements of the first offense alone.

2. INTERSTATE COMMERCE—WHAT CONSTITUTES—LOTTERY TICKETS.

The provision of Act March 2, 1895, that "any person who shall cause to be * * * carried from one state to another in the United States any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery * * * or similar enterprise," shall be guilty of an offense, is within the constitutional power of congress to regulate commerce among the states, and covers a case where an individual carries from one state into another a ticket or a slip of paper which is understood by all the parties to the transaction to represent the interest of the purchaser of a chance in a lottery or "policy" game in which the drawing has not taken place.

3. CONSPIRACY—CRIMINAL PROSECUTION—SUFFICIENCY OF EVIDENCE.

To sustain an indictment charging a conspiracy to commit an offense against the United States, under Rev. St. § 5440, it is not necessary that

there should be direct evidence of a formal agreement; but it is sufficient if the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a preconcerted plan and purpose.

4. CRIMINAL LAW—REVIEW ON APPEAL—OBJECTIONS TO EVIDENCE.

It is the established rule in the courts of the United States that, to entitle a party to a review of rulings admitting evidence, counsel, in making their objections, must state the grounds thereof.

In Error to the District Court of the United States for the Southern District of Ohio.

Thomas Shay, for plaintiffs in error.

Sherman T. McPherson, for the United States.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge. The above-named plaintiffs in error were convicted in the court below of the offense of having conspired to commit an offense against the United States. The statute which creates the offense of conspiracy and makes it punishable is section 5440 of the Revised Statutes, as amended by the act of May 17, 1879, which is as follows:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment of not more than two years, or to both fine and imprisonment, in the discretion of the court."

The offense which the plaintiffs in error are charged with having conspired to commit is defined by the first section of the act passed March 2, 1895, entitled "An act for the suppression of lottery traffic through national and interstate commerce and postal service subject to the jurisdiction and laws of the United States." This section reads as follows:

"That any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same,
or deposited in or carried by the mails of the United States,
or carried from one state to another in the United States, any paper, certificate, or instrument purporting to be or represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance, or shall cause any advertisement of such lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance, to be brought into the United States, or deposited in or carried from one state to another in the same shall be punishable in the first offense by imprisonment for not more than two years or by a fine of not more than one thousand dollars, or both, and in the second and after offenses by such imprisonment only."

We have divided the clauses of this section in such manner as to indicate what we conceive to be the true construction thereof, as will be hereafter explained. The indictment charges the respondents with having conspired within the district—

"To cause to be carried from one state to another in the United States, to wit, from the city of Newport, in the state of Kentucky, to the city of Cincinnati,

106 F.—57

in the state of Ohio, papers, certificates, and instruments purporting to be and to represent, as they then and there well knew, tickets, chances, shares, and interests in and dependent upon the event of a lottery and similar enterprise offering prizes dependent upon lot and chance; that is to say, to cause to be carried as aforesaid papers, certificates, and instruments purporting to be and to represent the chances, shares, and interests in the prizes which, by lot and chance, might be awarded to persons (to these grand jurors unknown) who might select certain numbers which by lot and chance should be included in twelve numbers drawn and selected as hereinafter stated, at certain drawings in lottery, which was an enterprise offering prizes dependent upon lot and chance, and commonly known as 'policy,' and consisted, as they then and there well knew, in the drawing and selection by lot and chance, at stated intervals, of twelve of the numbers from one to seventy-eight, inclusive, and of awarding prizes in various amounts (to these grand jurors unknown) to those who prior to the time of any one of said drawings and selections, upon the payment of a small sum of money, may have selected various combinations of numbers included in the said twelve numbers thereafter drawn and selected by lot and chance as aforesaid."

### And it is further charged that:

"In pursuance of the conspiracy, and to effect the object thereof, being for the purpose of causing to be carried from one state into another in the United States, to wit, from the state of Kentucky to the state of Ohio, as aforesaid, papers, certificates, and instruments purporting to be and to represent tickets, chances, shares, and interests in and dependent upon the event of a lottery and similar enterprise offering prizes dependent upon lot and chance, as aforesaid, as they then and there well knew, said Anthony Hoff, John Edgar (alias Peter Edgar), Charles W. Reilley, and John Francis did then and there, on said date aforesaid, in the county, state, circuit, division, and district aforesaid, unlawfully, knowingly, and feloniously cause to be carried from one state to another in the United States, to wit, from Newport, in the state of Kentucky, to Cincinnati, in the state of Ohio, five certain papers, certificates, and instruments purporting to be and to represent chances, shares, and interests in the prizes to be awarded by lot and chance in the drawings to be made thereafter in said certain lottery, commonly known as the game of 'policy,' which said papers, certificates, and instruments were in the words and figures, following, to wit: [Here follow certain blocks of figures and letters,]"

### And thereupon the indictment proceeds:

"Said papers, certificates, and instruments, and the letters and figures thereon, purported and represented to be and were tickets, chances, shares, and interests in and dependent upon the event of a lottery and similar enterprise offering prizes dependent upon lot and chance, and were and did represent various combinations of numbers selected by one H. T. Harrison, and other players and persons to the grand jurors unknown, as and being their interest and chance in a proposed drawing of said lottery, in accordance with the general scheme and plan hereinbefore described,—contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

Upon the trial the government offered evidence tending to prove that the respondents adopted a scheme of lottery business, called by them "policy," which they subsequently carried into operation, of the character following: The principal office for the transaction of the business was located in a building in Cincinnati, Ohio. The place where the drawings of numbers from a wheel were made was located in another building or room adjoining the principal office and connected with it by a private way. In various places in that city and elsewhere, in Ohio and other states, one, at least, being in

Newport, Ky., they had offices or stations at which the patrons purchased tickets or chances in the drawings to be thereafter made in Cincinnati, at the place mentioned. Successive numbers from 1 to 78, inclusive, were each day put into the wheel, and at each drawing 12 numbers were taken out. A list of these 12 numbers was taken into the principal office and there recorded. Several hours in the day before these drawings respectively took place, the patrons purchased chances at the suboffices or stations from an agent of the respondents, or from one of the latter, in charge at that place. In this instance the purchase was made of the respondent Hoff at the Newport office. The purchaser (Harrison, in this instance) chose 3 of the numbers from 1 to 78, inclusive, and wrote them upon a slip of paper, of which, according to the method of doing business, he kept a duplicate. He handed his list of numbers, with figures to denote the sum paid, upon a slip of paper, and the money to pay for his chance, to the person in charge, to be transmitted to the principal office in Cincinnati, by the "carrier," who would call to take them up. When these slips and the moneys were all brought into the principal office, the drawing above mentioned took place. If the 3 numbers on the slip were of the 12 drawn from the wheel, the purchaser would win the prize, $200, when the game (of which there were several forms) was played on the basis above stated. If not, he lost. A report of the drawings was sent back to the station from which the slip came, and, if any purchaser had made a "hit," his slip would be returned with the prize to be there delivered to him. Of the respondents, Reilley was in charge of the principal office, Francis of the drawings, Hoff of the station in Newport, as already stated, and Edgar was the carrier. The slip of paper taken by the carrier represented the interest of the purchaser of the chance, and, although containing figures only, it had a definite meaning, and was understood by all the parties concerned. It was the transportation of some of such lists, one being that of Harrison, from Newport, Ky., to Cincinnati, Ohio, with knowledge of their character, that constituted the overt act done in pursuance of the conspiracy.

The first question to be resolved arises upon the contention, made by counsel for plaintiffs in error, that upon the due construction of the first section of the act of March 2, 1895, the successive clauses enumerating the several cases in which the offense may be committed all depend upon a condition which is supposed to exist in consequence of the words first occurring, that the paper, certificate, etc., has been brought into the United States from abroad for the purpose of disposing of the same. It is argued that this must be so for the reason, and this is the principal ground of the argument, that by the second section of the act there is an express provision that no former statute against the establishment of lotteries, traffic in lottery tickets, and the circulation thereof or of advertisements relating thereto, should be deemed to be repealed by implication. Without going through with a reference to and an analysis of all such former statutes, it is sufficient to say that none such has been

brought to our attention which is inconsistent with the statute in question, unless it be the act of September, 1890, which relates to the carriage of matter concerning lotteries in the mails, and which imposes a different penalty in such cases from that imposed by the act in question. From the fact of such discrepancy, it is contended that congress must have intended that the language of the later act should be construed to refer only to things brought in from abroad to be disposed of in this country, against which there had been no previous legislation imposing any other penalty than a forfeiture. There is some force in this argument, but we do not think it sufficient to overcome the clear indications to the contrary. In the first place, it would render the composition of the first section of the act of 1895 ungrammatical. In the next place, the title to the act indicates an intention to exert the power of congress in all directions authorized by the clauses of the constitution relating to the regulation of commerce and the establishment of a mail service. Besides, the distribution of subjects, by the language used in the latter part of the section, reflects upon the former part a similar meaning, and the whole section is in apt language to cover the ground indicated by the title of the act, and we see no necessity for extending the condition that the matter is brought in "for the purpose of disposing of the same" to other cases than that of bringing it into the United States from abroad. We have no doubt that the purpose of congress was to lay its hand upon the business at each and every one of the enumerated steps taken for the purpose of carrying it on, and that one of the steps it had in contemplation was the carrying of the instruments employed in the business from one state to another, and that as to this offense no qualification that the act should be done with the purpose of disposing of the thing carried was intended. We may at this point observe that, inasmuch as the section of the act under consideration constitutes three distinct offenses, we do not conceive it to be necessary to determine to what extent the act is inconsistent, in respect to the forbidden use of the mails, with former statutes, or, if there be such inconsistency, what the effect thereof may be; for the case before us does not involve that offense.

But the question upon which we have the gravest concern, and which is of much importance, arises upon the objection that the act of March 2, 1895, in so far as it relates to the mere carrying of the obnoxious matter from one state into another, though done with knowledge of its character, transcends the constitutional power of congress. The statute was enacted in the exercise of the power to regulate commerce with other countries and between the states, and the power to establish post offices and post roads. That part of the statute on which the present indictment is founded depends upon the authority which may be exercised under the grant to congress of the first of these powers, and the question is whether the business in which these parties were engaged is "commerce" within the meaning of that term in the constitution. The question opens a field upon which some lines have been clearly marked, but with respect to the

particular inquiry with which we have to deal we have no distinct guide. Commerce is said by Chief Justice Marshall in the leading case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, to undoubtedly mean "traffic," but to mean more than that, and to signify "intercourse." But both of these latter are general words, and do not precisely define what kind of intercommunication is meant; and we have to follow the course of subsequent adjudication in further elucidation of the scope and meaning of the word. Without going into other lines of inquiry than those which are most nearly relevant to the present subject, we come to the case of Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357, where the question was whether an agent of a New York insurance company, who was engaged in effecting insurance for his company in Virginia with residents of the latter state, was subject to certain regulations of that state of the conditions and manner under and in which such business should be done; and it was held— First, that it was competent for the state to prescribe the conditions upon which the foreign corporation should be admitted to do business in the state; and, second, that the business of insurance, conducted as that was, was not interstate commerce. It is to be observed, however, that, as pointed out by Mr. Justice Field, the business there in question did not involve intercourse between one party in one state and another party in another state; for the transactions took place wholly in Virginia, and the communications between New York and Virginia were wholly between the constituents of one party,—that is to say, the insurance company and its agent,—and the dealing was not between those persons. Said Mr. Justice Field:

"The policies do not take effect—are not executed contracts—until delivered by the agent in Virginia. They are, then, local transactions, and are governed by the local law. They do not constitute a part of the commerce between the states, any more than a contract for the purchase and sale of goods in Virginia by a citizen of New York while in Virginia would constitute a portion of such commerce."

That case would seem to have sometimes received a wider interpretation than the decision upon the facts would justify, and to have been supposed to justify the proposition that a contract of insurance effected through interstate communication is not interstate commerce; but no authoritative decision affirming that proposition has been cited or has been found by us.

In the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, Mr. Justice Miller, in the course of reasoning from analogies, at page 95, 100 U. S., and page 552, 25 L. Ed., said that:

"In Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357, this court held that a policy of insurance made by a corporation of one state on property situated in another was not an article of commerce, and did not come within the clause we are considering. 'They are not,' says the court, 'commodities to be shipped or forwarded from one state to another, and then put up for sale.' On the other hand," pursues the learned justice, "in Almy v. California, 24 How. 169, 16 L. Ed. 644, it was held that a stamp duty imposed by the legislature of California on bills of lading for gold and silver transported from any place in that state to another out of the state was forbidden by the constitution of the United States, because, such instruments being a necessity to the transaction of commerce, the duty was a tax upon exports."

With great deference to the learned justice, we cannot think that his statement of what was held in Paul v. Virginia was correct; and, moreover, the ground on which he says that that decision was placed, namely, that policies of insurance are not commodities to be shipped from one state into another and there put up for sale, could not be supported as sufficient, in view of what has been decided in other cases presently to be referred to, and would, as it seems to us, be much narrower than the bounds of the definition given in Gibbons v. Ogden.

The case of Paul v. Virginia was again cited in Philadelphia Fire Ass'n v. New York, 119 U. S. 110, 7 Sup. Ct. 108, 30 L. Ed. 342, but only, in that case, in support of the proposition that a state has power to prescribe the conditions on which a foreign corporation may be admitted to do business in the state. The question there was whether a foreign corporation which had entered the state and carried on business therein could question the validity of a law of the state prescribing such conditions. Paul v. Virginia was again referred to in Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297 (at page 653, 155 U. S., page 209, 15 Sup. Ct., and page 300, 39 L. Ed.), which was a case involving the validity of a statute of California making it a misdemeanor for a person in that state to procure insurance for a resident thereof from a foreign corporation which had not filed the bond required by another statute of that state. The court held that the law was a valid exercise of the right of the state to prescribe conditions upon which the foreign corporation should be allowed to do business therein, unless such business of the foreign company was one of a "federal nature," one class of which is interstate commerce. To the contention that marine insurance (which was the business that the respondent was charged with having conducted without filing the bond required) was interstate commerce, and so beyond the reach of state authority, it was replied that:

"This proposition involves an erroneous conception of what constitutes interstate commerce. That the business of insurance does not generically appertain to such commerce has been settled since the case of Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357. See, also, Philadelphia Fire Ass'n v. New York, 119 U. S. 110, 7 Sup. Ct. 108, 30 L. Ed. 342, and authorities there cited."

It is not within our province to question the law as declared by the court in that case, nor have we any disposition to do so; but, for the purpose of comparing the classes of cases which we deem most relevant to our present duty, we are, no doubt, permitted to say that what we understand the language of the opinion last cited to mean is that the effecting of insurance is not necessarily interstate business, and would not be so where the contract was made in the state and the participants in the transaction were in the state. The case does not decide that if, by the method of doing the business, the party desiring insurance in one state should transmit his application therefor to an insurer in another state, and the insurer should thereupon transmit to the insured his acceptance of the application, this would not constitute interstate commerce. But, if this were so established, we do not think the doctrine would be applicable here, for reasons hereinafter stated. This class of cases is principally relied upon by

counsel for plaintiffs in error as declaring the rule that in order to constitute commerce there must be traffic in commodities, and that interstate commerce involves also the transportation of such commodities from one state to another, and that mere business intercourse between parties residing in different states, unaccompanied by the transportation of commodities such as are bought and sold by traffic, is not within the scope of commerce between the states within the meaning of the constitution. But we do not think that, upon a comparison with other decisions of the supreme court, so broad a doctrine was intended to be affirmed in the cases to which we have referred.

Passing to other classes of cases arising upon the exercise of the power in question, it has been frequently held, as was said by Mr. Justice Bradley in Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, that the power of congress over interstate commerce is coextensive with its power over foreign commerce. Indeed, both are included in an identical grant. Can it be possible to hold that congress has not the power to prohibit the importation from abroad into the United States of instrumentalities for carrying on a business fraught with evil to its inhabitants? Or, to put a precisely relevant question, can it be doubted that congress has the authority to legislate against the importation of lottery tickets into the United States from foreign countries, as it has attempted to do by this act? It would seem that the denial of such power would be an unfortunate and uncalled-for restriction of the grant of authority intended by the constitution. Until recently congress had not seen fit to exercise its power in this direction, and for this reason the instance seems novel; but, in the circumstances, this is no argument against its existence.

In respect to the inquiry as to what constitutes interstate commerce, and particularly to the question whether it is limited to the case of traffic in and the transportation of commodities for the purposes of such traffic, reference may be profitably had to some other cases decided by the supreme court. We have already indicated our view that in Gibbons v. Ogden the subjects which were included in the power granted congress were not thought to be so restricted. In the case of Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158, it was held that the transportation of passengers, as well as freight, from one state to another by a ferry, was interstate commerce. In the case of Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962, it was held that the company's bridge across the Ohio was an instrumentality of interstate commerce, because it furnished the means of intercourse between the people of two states, and the taking of toll for the passage of persons, as well as of freight, was interstate business. In that case it was remarked by Mr. Justice Brown, in delivering the opinion of the court, referring to the Gloucester Ferry Co. Case:

"If, as was intimated in that case, interstate commerce means simply commerce between the states, it must apply to all commerce which crosses the state line, regardless of the distance from which it comes or to which it is

bound. In other words, if it be commerce to send goods from Cincinnati, in Ohio, to Lexington, in Kentucky, it is equally such to send goods or travel in person from Cincinnati to Covington."

And again:

"Commerce was defined in Gibbons v. Ogden, 9 Wheat. 1–189, 6 L. Ed. 23–189, to be 'intercourse,' and the thousands of people who daily pass and repass over the bridge may as truly be said to be engaged in commerce as if they were shipping cargoes of merchandise from New York to Liverpool."

In that case the "bridge" was a mere instrumentality. It was the use of it for the purpose of intercourse between the people of the two states which impressed upon the structure the character of an instrumentality or agency of such intercourse. Indeed, it is impossible to conceive that an instrument by which business is transacted can have any commercial character otherwise than as is reflected upon it by the business itself. Whether it be a ferry, a bridge, a railroad, or a telegraph line, the agency has no intrinsic quality which brings it within the purview of the commerce clause of the constitution. It acquires that quality from its appropriation to the uses of interstate commerce.

In Western Union Tel. Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067, it was decided that intercourse by the telegraph between the states is interstate commerce, and that a tax on messages is a tax on the commerce itself; and this doctrine has been reaffirmed in several subsequent cases. So it was held in the Passenger Cases, 7 How. 283, 12 L. Ed. 702, and Henderson v. Mayor, etc., 92 U. S. 259, 23 L. Ed. 543, that the importation of passengers into the United States was commerce with foreign nations, and so within the control of congress; and so it is not doubted that congress may legislate for the exclusion of passengers who, from diseased or other conditions, would be an offense to the welfare of the public. And in Crandall v. Nevada, 6 Wall. 35, 18 L. Ed. 744, the doctrine of the cases last cited was applied to the transportation of passengers by a railroad from one state into another. These cases seem to us altogether inconsistent with the idea that interstate commerce is limited to traffic in commodities or merchandise. In the telegraph cases, for instance, it is nowhere suggested that the messages which would be exempt from state taxation should be such only as relate to traffic. In the passenger cases there is no element of barter of commodities or merchandise of any sort.

In the present case it would seem that the enterprise in which these parties are alleged to have been engaged was one which involved business intercourse between parties in different states, and that by means of the transportation of the instruments with which it was carried on from one state into another; and it is not material that transportation was done by a private individual, rather than by a corporation. The slip which represented the interest of the buyer of the chance, its contents being understood by all the parties to the transaction, was a ticket in the lottery. That the game was a lottery has several times been decided in the state courts. People v. Elliott, 74 Mich. 264, 41 N. W. 916, 3 L. R. A. 403; Com. v. Sulli-

van, 146 Mass. 142, 15 N. E. 491; Wilkinson v. Gill, 74 N. Y. 63; State v. Kansas Mercantile Ass'n, 45 Kan. 351, 25 Pac. 984, 11 L. R. A. 430.

The inclination of our judgment is to hold that the statute in question is not invalid, and that the present case is covered by it. But, conceding that there may be some doubt of the correctness of our conclusion that the statute is within the power of congress, the doubt we have is not sufficient to justify us in holding it to be invalid. Authority to legislate upon the subject of interstate commerce is conferred upon congress in terms which contain no restriction. That body must, from the necessity of the case, determine to what particular matters its power extends. Its determination is not final, but it should be made unmistakably clear that the assumption was erroneous before the courts can be justified in holding that the power did not exist.

It is further objected that the indictment is defective in not showing that a lottery was being conducted. No objection was made on this account either before or at the trial. We think it appears with reasonable certainty that such a transaction was being carried on, although the averments are not, perhaps, so direct and specific as would have been necessary to encounter a prompt objection on that account. The indictment is much more full and specific than that in Com. v. Sullivan, supra, which the court said was "well enough."

It is also urged that the evidence did not justify the verdict, in that there was no proof of conspiracy to do what was done. As has been often remarked, it is not necessary that direct evidence of a formal agreement should be given in such cases. If the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a preconcerted plan and purpose, that is sufficient; and we think the evidence was such as to warrant the verdict.

Many objections were made upon the trial to the rulings of the court in admitting evidence. More than 150 errors are assigned, a large proportion of which relate to these rulings. Many of the objections related to similar matters, and there was needless and tiresome repetition. We have, however, gone through the bill of exceptions, and have found no instance in which any ground or reason whatever was assigned on which the objections were made. The reason for the rule requiring counsel to state the grounds of their objections is augmented where the frequency of objections may lead the court to the conclusion that the counsel is content to take his chances in finding the reasons afterwards. The rule itself is settled by a great number of decided cases, many of which are collected in 8 Enc. Pl. & Prac., at page 163; and see, especially, as indicating the practice in the courts of the United States, Camden v. Doremus, 3 How. 315, 11 L. Ed. 705, and Tabor v. Bank, 10 C. C. A. 429, 62 Fed. 383.

General exceptions were taken to the charge of the court to the jury. Some of them have been disposed of by what we have said in dealing with the topics already discussed. We have examined the instructions of the court, as well as the requests of counsel for the re-

spondents to charge the jury, and think the case was fairly submitted to the jury, and that all proper instructions were given them. In view of the multitudinous exceptions and assignments of error under this head, we must content ourselves with refraining from a separate discussion of each. The judgment will be affirmed.