### DOYLE v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. April 20, 1909.)

No. 1,875.

CRIMINAL LAW (§ 427*)—USING MAILS TO DEFRAUD—CRIMINAL PROSECUTION—EVIDENCE.

In a prosecution for using the mails in conducting a scheme to defraud in violation of Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696), there is no hard and fast rule requiring that concert of action between two defendants should first be shown before evidence of acts of one can be admitted against the other, but the order of evidence is within the discretion of the court, and it is sufficient if the jury, before considering such evidence, are satisfied either by direct evidence or by proof of facts and circumstances from which it may be reasonably inferred that such concert existed, and that defendants were conducting a joint scheme.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1013; Dec. Dig. § 427.*]

In Error to the District Court of the United States for the Western District of Tennessee.

E. E. Wright, for plaintiff in error.
Casey Todd, for the United States.

Before LURTON and SEVERENS, Circuit Judges, and TAYLER, District Judge.

SEVERENS, Circuit Judge. The indictment in this case contained six counts. The plaintiff in error was convicted upon the first three,

and was acquitted, by direction of the court, of the offenses alleged in the other three. The first three of the counts charged the defendant, Doyle, and other persons, who were not found, with having violated the provisions of section 5480 of the Revised Statutes (U. S. Comp. St. 1901, p. 3696) by using the mails of the United States for the promotion of a scheme devised by them to defraud the persons severally mentioned in the said three counts and other unnamed persons. These counts are similar in their character, except that they each designate different persons intended to be defrauded, and different times and places when and where the fraudulent practices were intended to be, and actually were, practiced. The scheme to defraud, as the charge is, was to effect sales of "mackintosh" coats by means of false representations of the name and place of business of the reputed seller—that is to say, the "Goodrich Mackintosh Company, Branch Office, Memphis, Tennessee"—and by the employment of an intricate gambling device whereby tickets were to be sold as in a lottery, and the holder of the winning ticket would take the coat, and the party operating the scheme would also be entitled to a coat for his pains. This local operator was to forward by mail the proceeds of the sale of tickets to the defendants, or some of them, at Memphis, where they would receive the letters containing such proceeds, and, on receipt, they would be required to send the coats.

It was further alleged in the indictment that, in devising the scheme to defraud, the defendant did not intend to furnish the coats so pretended to be sold to the winner at the lottery nor to the persons who should effect the sales. Upon the trial evidence was given to show that at the time when the scheme is alleged to have been in operation the defendant Doyle was staying at a saloon in Memphis belonging to one King. He testified that he was not operating the saloon, except that he was general manager, and making collections for King in the latter's absence. Further evidence was to the effect that before King left Doyle went with a man whom he called King to the post office at Memphis and made application for a box to be rented in King's name, and lock box No. 370 was assigned to him. In the "literature" which was employed in carrying on the business of selling the mackintosh coats the inference was conveyed that King was an agent or manager of the Goodrich Mackintosh Company, to whom all letters intended for the company should be addressed, and to whose order all remittances were to be made payable. Later on Doyle got the letters at the Memphis post office which were directed to King at that office, and obtained moneys or postal orders payable to King contained in the letters, which orders were indorsed by Doyle in King's name to himself. At about the time when the lock box at the post office was secured Doyle took a person whom he called "McKnight" to a printer's, and there "McKnight" secured a quantity of letter paper, envelopes, business cards, and letter heads purporting to concern the business of the Goodrich Mackintosh Company. This "McKnight" shortly thereafter was engaged "in the field," as the saying is, in disposing of the mackintosh coats in the manner described in the indictment, carrying along with him and using the stationery of the so-

called Goodrich Mackintosh Company. He made the arrangements for disposing of the coats with the several parties named in the indictment. They made the sales by the method above stated, received the money for the tickets, forwarded it by postal orders to "King" at Memphis, where Doyle got the proceeds. No coats were ever received either for the winners or for the agents, and there was no such concern as the Goodrich Mackintosh Company discoverable at Memphis. The evidence so clearly showed that "McKnight" and "King" were one and the same person that counsel for the respondent seems in his brief to accept that as a fact. At all events, it seems a safe inference. Several of these agents who effected sales for the Goodrich Mackintosh Company were called as witnesses on the trial and testified under objection by counsel for the defendant about the transactions and the conversations with "McKnight" on the occasions when they were employed by him. The objection to what "McKnight" said or did on these occasions was:

"That the defendant Doyle was never in the state of Arkansas, and the conversation and contract entered into by and between the codefendant McKnight and the witness Moseley were not in the presence of the defendant, Doyle, and such contract, if ever made, was made in the state of Arkansas, and not in the state of Tennessee. And for the further reason that no connection between them is shown by the witness, or that the defendant, Doyle, knew anything of the contract entered into or had anything to do with the correspondence which took place between him and McKnight."

The court overruled the objection and defendant excepted to the ruling of the court, and stated to the jury that this part of witness' evidence could not be considered by them against this defendant until they were satisfied from the other evidence in the case that the defendant was a party to the scheme to defraud, and that this agent in Arkansas was the agent of the defendant, and others who had advised and were executing this scheme. And the stress of the argument is to demonstrate that the court erred in permitting such proof, and that without it there was no evidence on which the defendant could have been convicted.

If it was intended by the objection just mentioned to insist that Doyle's connection with the scheme should be first shown, there are two answers: First, that enough had already been proven to warrant the belief that Doyle was involved in the scheme; and, secondly, there is no hard and fast rule that the evidence of concert should be first put in. The substance of the rule is that the jury must be satisfied that the concert existed before they can consider what one of the parties did or said in carrying out the joint purpose. In overruling the objection, the court very properly instructed the jury as to what the rule is. Besides, the order of production of evidence is one largely in the discretion of the court. But, further, as has been observed in many instances, probably in most, direct proof of the formation of the plot is not obtainable. Such plots are usually formed in secret. The existence of preconcert may be inferred from the subsequent conduct of the parties. In Reilley v. United States, 106 Fed. 896, 905, 46 C. C. A. 25, 34, we said:

"It is also urged that the evidence did not justify the verdict, in that there was no proof of conspiracy to do what was done. As has been often remarked,

it is not necessary that direct evidence of a formal agreement should be given in such cases. If the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a pre-concerted plan and purpose, that is sufficient; and we think the evidence was such as to warrant the verdict."

And again in Chadwick v. United States, 141 Fed. 225, 241, 72 C. C. A. 343, 359, we said:

"The fact of the existence of a conspiracy is a fact which is seldom capable of express or direct proof. But evidence of an express agreement to violate the certification statute was not necessary. Evidence of facts and circumstances from which the existence of a preconcerted plan might be inferred is enough. And so, too, the facts and circumstances from which a conspiracy is to be inferred may be and often must be shown singly. Their collocation is for the jury, and the order in which they may be shown is generally one in the discretion of the court"—citing Wharton on Criminal Law (10th Ed.) 1398.

Two other assignments of error are added. They are assignment No. 2, "there is no evidence upon which the verdict of the jury or the judgment of the court can be sustained," and assignment No. 3, "The verdict of the jury and the judgment of the court is contrary to the law and the evidence." We have recited enough of the evidence and of the facts to show that neither of these contentions is maintainable. No error is shown by the record, and the judgment must be affirmed.