## FOWLER et al. v. UNITED STATES.*

(Circuit Court of Appeals, Ninth Circuit. May 16, 1921.)

No. 3597.

1. **Conspiracy ⬳33—Larceny ⬳7—Government, in control of railroads, had special property in equipment sufficient to sustain conviction for stealing government property.**

The federal government, while in control and management of the railroads in pursuance of law, was a bailee for hire thereof, and as such had a special ownership of the railroad property sufficient to sustain a conviction for purloining such property, under Penal Code, § 35, as amended by Act Oct. 23, 1918 (Comp. St. Ann. Supp. 1919, § 10199), or for conspiracy to defraud the government by taking such property, under Penal Code, § 37 (Comp. St. § 10201).

2. **Larceny ⬳32(1)—Ownership can be alleged in lawful possessor, regardless of owner of title.**

In an indictment for larceny, it is sufficient to allege the ownership in the lawful possessor of the goods, whether such owner has legal title or not.

3. **Conspiracy ⬳24—Formal agreement between parties is unnecessary.**

A formal agreement between the parties concerned is not essential to the formation of a conspiracy, but it is sufficient if there is concert of action, all the parties working together understandingly, with a single design, for the accomplishment of a common purpose.

4. **Criminal law ⬳678(1)—Evidence held to show general plan for looting railroad cars, so that election between conspiracies was unnecessary.**

In a prosecution against a large number of defendants for conspiracy to steal property in interstate shipment, and to steal railroad property under control of the government, evidence *held* to sustain an inference that the various acts shown by the government's evidence were part of one general plan by railroad employés and others to loot the railroad cars during transit, though the defendant who pleaded guilty had dealt with only three of the other defendants in one transaction, so that it was not error for the trial court to refuse to compel the government to elect on which particular transaction it would rely.

5. **Witnesses ⬳352—Evidence defendant's witness knew defendant had been convicted of crime held admissible as to credibility of witness.**

Where witness for defendants testified she had known one defendant for several years, and that he had been a guest at her hotel, it was not error to permit cross-examination to show that she knew he had previously been convicted of a crime, which had some bearing on her credibility.

6. **Conspiracy ⬳45—Evidence as to method of opening freight cars without breaking seal held competent.**

In a prosecution for conspiracy to steal goods from interstate shipments, testimony by a witness that he was acquainted with a method of opening doors of a freight car to permit entrance without breaking the seal, and a description of the method was competent.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Rehearing denied August 1, 1921.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Lemuel S. Fowler, Thomas Singer, and others were convicted of conspiracy, and the named defendants bring error. Affirmed.

The plaintiffs in error, Lemuel S. Fowler and Thomas Singer, with 15 others, were indicted under three counts:

Under count 1, for having conspired to commit an offense against the United States—that is, to violate section 1 of the Act of Congress approved February 13, 1913 (Comp. St. § 8603); the purposes and objects being to break the seals of railroad cars containing interstate and foreign shipments of freight and express, with intent to commit larceny therein, to enter such cars with intent to commit larceny therein, to steal, take, carry away, and conceal, and by fraud and deception obtain from certain railroad cars, station houses, and platforms, with intent to convert to their own use, certain goods and chattels of value, then and there moving in interstate commerce and constituting interstate shipment, and to buy, receive, conceal, and have in their possession certain goods and chattels of value, which were to the conspirators known to have been stolen, taken, and carried away from such railroad cars, station houses, platforms, and depots, with intent on the part of those engaged in the theft to convert the same to their own use, such goods constituting a part of interstate shipment, etc.

Under count 2, for having conspired to violate section 35 of the Penal Code, as amended by Act of Congress approved October 23, 1918 (Comp. St. Ann. Supp. 1919, § 10199); the purpose and object being to take, steal, and carry away for their own use, with intent to purloin, certain personal property of value of the United States, from certain railroad cars, station houses, platforms, and depots then and there in federal possession and control.

Under count 3, for having conspired to defraud the United States by stealing, carrying away, purloining, and embezzling, and converting to their own use, goods and chattels then and there moving in and constituting interstate shipment under federal control, and then and there being in the possession of the United States as a common carrier of goods for hire; also certain tools, equipment, and property then and there used in the maintenance and operation of certain railroad routes and transportation systems then and there under federal control.

Certain of the defendants, including Fowler, but not Singer, interposed a demurrer to each count of the indictment, which was overruled. After trial, Fowler and Singer were, with others of the defendants, but not all of them, convicted. From the judgment following conviction, Fowler and Singer prosecute a writ of error.

John F. Dore, of Seattle, Wash., for plaintiffs in error.

Robert C. Saunders, U. S. Atty., and Francis C. Reagan, Asst. U. S. Atty., both of Seattle, Wash.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above).
[1] By their third assignment of error, plaintiffs in error challenge the sufficiency of each count of the indictment. Counsel in his brief here admits the sufficiency of the first count, but insists that the second and third counts are not good, because the property that it was charged to be the purpose of the conspirators to purloin was not the property of the United States, and could not be so considered, within

the purview of section 35 of the Penal Code as amended, or of section 37 of such Code (Comp. St. § 10201).

We think it a sufficient answer to this contention to say that the general government was at the time in the actual control and management of the railroads of the country in pursuance of law, and was acting in that capacity as a bailee for hire. As such common carrier, it had a special property in the goods, chattels, and merchandise carried, and by virtue of such ownership it was entitled to maintain as against third parties an action for damages to the property, or to recover possession thereof, if wrongfully taken from it. 6 Cyc. 435.

[2] So it is that in an indictment for larceny it is sufficient to allege ownership in the lawful possessor of the goods, whether such owner has the legal title or not. 25 Cyc. 89. We are of the opinion, therefore, that such special ownership in the government, in view of the indictment, meets the purposes of section 35 of the Penal Code as amended, and of section 37 of such Code, and that counts 2 and 3 of the indictment are sufficient.

Assignments of error 1, 2, and 4 may be considered together. They relate to certain motions addressed to the court to require the government to elect upon which of several supposed conspiracies it would proceed to trial. For instance, at the conclusion of the testimony given by William Ratcliff, a witness for the government, who was jointly indicted with the other defendants and entered a plea of guilty, and when it was attempted to examine Roy Ayers, also a witness for the government, the defendants moved that the government be required to elect as to which of the several conspiracies that might appear to have been entered into by the several alleged conspirators it would pursue on the trial. The statement of counsel at the time indicates the purpose of the motion. He says:

"Now, to narrow this case, we demand at this time, or at least to save time, the government state to the court what conspiracy they are trying here, and who they intend to prove the conspirators are, and they be permitted to introduce no testimony against any defendant, except such as they may state to the court their proof will show to be members of the conspiracy that Ratcliff has already testified to."

The court overruled the motion, on the ground that he could not say in advance what the evidence would be. This ruling counsel now admits was not error. At the conclusion of the government's testimony, the defendants again moved:

"That the government be compelled to elect upon which of the number of separate and distinct and unrelated and disconnected criminal agreements the proof as framed shows to have been established the government seeks a conviction."

This was based upon the contention that the testimony of Ratcliff disclosed that he had an agreement with Dave Jones and Hanson to steal certain shoes and matting, and that he never had any further criminal agreement with any of the other defendants, or any person, except the arrangement he had with the decoy salesman, Ayers.

Ratcliff did say, on cross-examination, that Hanson and Jones were the only defendants with whom he had an agreement to commit a

273 F.—2

crime against the railroad. This relates to an express understanding he had with these two defendants. Ratcliff was a conductor on a freight train of the railroad. C. H. Goldman, Dave Jones, and H. W. Hanson were brakemen on the same train. Ratcliff testified that he overheard a conversation between Jones and Hanson relative to getting some cases of shoes from a freight car; that after the conversation they carried the shoes off the train and put them in the salal brush; that Hanson said he had a sale for the shoes, and that the money would be divided among the three of them (Ratcliff, Jones, and Hanson); that Hanson gave samples of the shoes to a man by the name of Ayers, to be sold at Renton; that later, on the evening of March 27th, the witness, Hanson and his wife, and Ayers went to the place of deposit and got two cases of the shoes, put them into Ayers' car, and took them to Auburn. On arriving there Hanson, claiming to be tired, prevailed upon Ratcliff to go to Renton and collect the money for the shoes. Witness and Ayers went to the St. Elmo Hotel in Auburn to find Fowler, one of the plaintiffs in error. Not finding him there, they went to the foot of Cemetery Hill and worked a signal a few times, in response to which Fowler came, with another man, in a car containing 12 automobile tires. After some conversation between Ayers and Fowler, Ayers, accompanied by witness, drove his car to Renton, followed by Fowler. Ayers drove into a garage at Renton, and after unloading the shoes backed out. Fowler and Mellison—the latter being the man first seen with Fowler—drove their car into the garage. At this time the officers came and arrested Ratcliff, Fowler, and Mellison. Ratcliff further testified to the fact that Hanson and Jones took two rolls of matting off Hanson's train on March 2d, which were afterwards hauled to Covington and put off in the brush. He also testified to some tire transactions he had with Hanson.

Roy Ayers, who was really a decoy, corroborates Ratcliff in almost every material detail as to their relations with Fowler and with each other, and it was he who had arranged to dispose of the shoes for Ratcliff and the tires for Fowler. Ayers testified, on cross-examination, that he learned that Fowler had tires to sell through a conversation with one Scott, and that Fowler came to him and told him he had 13 tires, and witness told him he had a buyer at Renton; that "Fowler was just an addition to the party." To the question, "You picked him up accidentally?" he answered, "Just accidentally."

Clifford W. Scott testified that he had a conversation with Fowler, in which he asked him if he had some tires he wanted to get rid of, to which Fowler answered in the affirmative, and that afterwards they met Ayers.

As to the defendant Thomas Singer, an overcoat and two suits of clothes were found in his possession. There is much detail about this. Singer was associated, in relation to the overcoat, with defendant Edward Bourdell, who, after he had changed his plea to guilty, committed suicide. It was also in testimony that Singer at one time was endeavoring to sell some shoes cheaply. Bourdell and Singer were operating together in that transaction.

It was further shown in evidence that 294 tires were shipped by railroad in interstate commerce from Seattle to Portland; that when checked up at Auburn 58 were found to be missing, and that 13 of these tires were found in the possession of Fowler at Renton; that a shipment of overcoats was made by railroad from Chicago to Seattle, which upon arrival was found to be short; 5 of these were found in the house of defendant Creed Lane, 2 in the possession of defendant Bellamy, and 1 in the store of Singer. The train crew that handled the car containing the goods in transit from Ellensburg to Auburn consisted of Conductor Thomas Jones, Creed Lane, and Ed Bourdell.

The theory of the government is plain, namely, that there was manifestly an organized group of evil-disposed persons who had for their purpose the looting of freight and express trains and cars, and the disposition of the spoils to avail themselves of the profits of their engagement. So it was that many persons were charged with conspiring to engage in the unlawful enterprise.

The contention of plaintiffs in error that the court should have directed the government to elect as to which of several conspiracies it should pursue is based upon the postulate or assumption that there were several groups of persons engaged in several distinct conspiracies, and that all were combined in the so-called dragnet of the government's indictment. This, counsel argues, is shown by the testimony of Ratcliff that the agreement to do the wrong in which he was implicated was between himself and two other persons only, namely, Jones and Hanson.

[3] However, when we come to understand of what a conspiracy consists and how it may be accomplished, if it be found that the postulate is without basis in fact, so far as the plaintiffs in error are concerned, it would follow that the contention is faulty. It is well settled that a formal agreement of the parties concerned is not essential to the formation of a conspiracy. It is sufficient if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose. 8 Cyc. 621. As is said in Reilley v. United States, 106 Fed. 896, 905, 46 C. C. A. 25, 34:

"If the evidence of the separate details of the transaction as it was carried out indicates with the requisite certainty the existence of a preconcerted plan and purpose, that is sufficient."

See, also, Davis v. United States, 107 Fed. 753, 46 C. C. A. 619, and Doyle v. United States, 169 Fed. 625, 95 C. C. A. 153.

[4] It will be seen by reference to the testimony that, while Ratcliff says his agreement was with Jones and Hanson only, he is found by his own statement to be acting with Fowler in the attempt to dispose of property that came off the freight cars operated by the railroad, and the testimony of Ayres is strongly corroborative of the circumstance. Further comment is unnecessary, as it is at once apparent that the strong tendency of the testimony is to the effect that Fowler was engaged in the same unlawful enterprise with Ratcliff, Jones, and Hanson.

As it relates to Singer, the testimony tends to show that he was acting in concert with Bourdell, who was at one time a brakeman on

the railroad, in dealing with goods that were manifestly a part of the loot that came from the cars used in interstate shipment. The proximity of time adds force to the idea that all, including Ratcliff, Jones, Hanson, Bourdell, and Singer, were engaged in the common enterprise of looting the trains and disposing of the spoils. It follows that the contention is not well founded and that there was no error in the action of the court in declining to require the government to elect as to which of the supposed conspiracies it should prosecute.

A reference to the testimony herein noted disposes also of the fifth assignment of plaintiffs in error, as it is at once apparent that the testimony was sufficient to carry the case to the jury for their consideration.

[5] The sixth assignment of error relates to a question propounded on cross-examination to Sarah Lewis, a witness for the defendants, as follows:

"You knew he [Fowler] was arrested and charged and convicted of stealing during that time?"

To which she was permitted to answer, and did answer:

"Yes; I did."

It appeared from her testimony that she had known Fowler for 9 or 10 years, and that he had been a guest at her hotel since 1913. In view of the association of the parties, and as the question had some bearing on witness' credibility, the objection was properly overruled.

Assignments of error numbered 7 and 8 have no exceptions to support them.

[6] The ninth assignment relates to testimony adduced and allowed to the effect that one Winquist, a witness under examination, was acquainted with the method of opening the doors of a freight car, so as to permit entrance without breaking the seal; the method being also described. The testimony was competent.

The remaining assignments—10, 11, and 12—have been examined, and we find them to be without merit.

Judgment affirmed.